## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| KEVIN S. BARKER, ERIC W. BAXTER, | ) | |
| MICHAEL A. GAFFNEY, REBEKAH L. | ) | |
| KAUTZ, RICHARD J. LAVALLIE, and | ) | |
| DAVID E. SOLSBERRY, on behalf of | ) | |
| themselves and all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | NO.  1:09-cv-02692-JOF |
| | ) | |
| CAPITAL ONE BANK (USA), N.A., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Kevin S. Barker, Eric W. Baxter, Michael A. Gaffney, Rebekah L. Kautz, Richard J. Lavallie, and David E. Solsberry file this their First Amended Class Action Complaint on behalf of themselves and all persons similarly situated within the United States.  This First Amended Complaint is filed for the purposes of adding two additional named Plaintiffs and updating Plaintiffs' allegations based on the current information and belief of Plaintiffs, who allege as follows:

<u>PARTIES</u>

1.

Plaintiff Lieutenant Commander Kevin S. Barker ("Lieutenant Commander Barker") is an officer in the Unites States Navy and a resident of the State of Florida.

2.

Plaintiff Eric W. Baxter ("Mr. Baxter") is a resident of the State of Florida.

3.

Plaintiff Michael A. Gaffney ("Mr. Gaffney") is a resident of the State of Massachusetts.

4.

Plaintiff Rebekah L. Kautz ("Ms Kautz") is a resident of the State of Kansas.

5.

Plaintiff Richard J. Lavallie ("Mr. Lavallie") is a resident of the State of Georgia.

6.

Plaintiff David E. Solsberry ("Mr. Solsberry") is a resident of the State of Georgia.

7.

The Currently Unnamed Plaintiffs are those individuals that have been harmed by Capital One's recent unilateral imposition of drastically higher annual percentage rates associated with Capital One credit card accounts.

8.

Defendant Capital One Bank (USA), N.A. ("Defendant" or "Capital One") and its related entities constitute one of the largest credit card issuers in the country. Defendant provides credit card services to millions of consumers, including Plaintiffs. Defendant has already been served with this lawsuit and has answered the original Complaint.

<u>JURISDICTION AND VENUE</u>

9.

This Court has personal jurisdiction over Defendant because it transacts business within the District.

10.

Because (i) diversity exists between named Plaintiffs and Defendant, which is headquartered in Virginia, and (ii) the aggregate claims of the putative class members exceed $5,000,000, this Court has original jurisdiction over this matter. <u>See</u> 28 U.S.C. §§ 1332(d)(2)(B), (d)(6).

3

11.

Venue is appropriate in this District because a substantial part of the events giving rise to the claims asserted herein occurred in the District.  See 28 U.S.C. § 1391(a).

FACTUAL ALLEGATIONS

12.

Defendant is a diversified financial services company offering a broad array of credit card and banking products and services to customers in the United States.

13.

For at least the past several years, Defendant has aggressively marketed its credit card products to customers throughout the country often by purporting to offer customers low, fixed interest rates on its credit card products.

14.

Defendant's troublesome marketing practices have been the subject of investigations by various state attorneys general.

15.

For example, in December of 2004 the Attorney General for the State of Minnesota filed suit against Capital One for failing to state in its promotional

materials and advertisements that it could increase interest rates on credit cards that were promoted as "fixed" rate credit cards.

16.

The Attorney General's Complaint alleged, *inter alia*, that Capital One ran numerous television advertisements that created "the false impression among consumers that, unlike competitors' credit cards, Capital One's credit cards have interest rates that will not increase."

17.

Many of the allegations from the Minnesota action are relevant in this litigation, to include the following:

> 8. Capital One employs false, deceptive, and misleading television advertisements to market to Minnesotans a brand image that, unlike its competitors, it is as an issuer of credit cards with interest rates that remain "low" and "fixed." In fact, Capital One increases the interest rates charged to the substantial number of cardholders who default ("penalty rate repricing"), and retains the right to increase interest rates for no reason at all pursuant to a "change-in-terms" provision in the credit card contract ("change-in-terms repricing").

> **Television Advertisements**

> 9. Capital One regularly runs television advertisements in Minnesota to promote its brand identity among both prime and subprime consumers as the credit card issuer with "low and fixed" interest rates. "Prime" consumers are those whom Capital One deems to be a lower credit risk due to the consumers' higher credit ratings, while "subprime" or "underserved" consumers are those whom Capital One

deems to be a higher credit risk based on their lower credit ratings due to a lack of credit history, past credit problems, or other reasons.

10. For instance, Capital One ran a series of three television advertisements for its "No-Hassle" credit card entitled "Catapult," "Whale" and "Toys," all of which advertised the card's interest rate as "low" and "fixed," and some of which advertised a specific "fixed" rate of "4.99%." This trilogy of television advertisements used the same basic format, script, graphics and visual punch line to create the false impression among consumers that, unlike competitors' credit cards, Capital One's credit cards have interest rates that will not increase. Illustrative copies of the advertisements are found on the videotape attached as Exhibit A.

**A. Catapult.** "Catapult" is set in a sidewalk café in a business district. As two men finish dining, the first man takes out a competitor's credit card and offers to pay for the meal because he's "getting a really low rate" on his credit card. Taking out his Capital One card, the second man tells the first, "I hope it's a low fixed rate like my Capital One No-Hassle card." Puzzled, the first man asks, "low *and* fixed?" Visibly nervous, the first man then asks, "What's going to happen to *my* rate?" As he finishes his question, Vikings representing Capital One's rapacious competitors storm the café, position the arm of a catapult under his chair, and propel him high into the air, while the second man looks on in horror--a graphic illustration of competitors' rising interest rates. A voiceover represents to consumers, "Get the Capital One No Hassle card for the nation's lowest fixed rates…," while the top two-thirds of the screen is consumed with prominent representations, such as:

Capital One
Nation's Lowest Fixed Rate
4.99% APR
By Mail Offer Only

**B. Whale.** "Whale" is set at a resort swimming pool, where the large black dorsal fin of a killer whale glides unnoticed among the swimmers. Two men and a woman have just finished a meal at a

poolside restaurant. Taking out a competitor's credit card, the man in the middle offers to pay for lunch because he is "getting a really low rate on [his] credit card." Holding up her Capital One card, the woman tells him she hopes his rate is "low *and* fixed…like my Capital One No-Hassle card." Puzzled, the man replies, "low *and* fixed? Well, what's going to happen to *my* rate?" As the man finishes his question, he is suddenly thrust high into the sky on the nose of the killer whale which has jumped out of the water directly beneath him. A voiceover represents to consumers, "Get the Capital One No Hassle card with the nation's lowest fixed rates," while water splashes over the side of the pool revealing thereon a prominent representation: "Nation's Lowest Fixed Rates."

**C. Toys.** "Toys" is set in a child's playroom being vacuumed by a woman in the background. An animated male toy, "Racer," enters the playroom in new boots. An animated female toy compliments Racer on his new boots. Racer tells her that he bought them with a competitor's credit card, which he proudly displays, and he boasts about its "amazing low rate." Producing a Capital One card, the female toy asks Racer if his card's interest rate will "stay low like my Capital One No Hassle card?" Worried, Racer asks, "What is going to happen to *my* rate?," after which he is immediately sucked up into the woman's vacuum cleaner. A voiceover represents to consumers, "Get the Capital One No Hassle card with a rate that starts low and stays low," while the top three-fourths of the screen is consumed with a prominent representation above Capital One's "No Hassle" logo:

Capital One<br>Starts Low<br>Stays Low

11. Capital One purports to qualify the overwhelming net impression of its advertisements that the rates on its credit cards remain "low" and "fixed" by placing momentary disclaimers on the television screen at the end of each advertisement, including phrases such as "terms subject to change without notice;" "additional terms and conditions apply, see your mailed invitation for more details;" or

sometimes "this offer assumes the account will be kept in good standing." Capital One's qualifications are not only unreadable in that they appear for four to six seconds at the bottom of the television screen in a paragraph of blurry fine print, but their substance does not meaningfully alert consumers to the use of penalty-rate or change-in-terms repricing.

### Capital One's Interest Rates are Not "Low" and "Fixed"

12. In truth, there is no such "fixed" rate on Capital One credit cards. Capital One increases the supposedly "low" and "fixed" interest rates of Minnesota cardholders through the use of penalty rate repricing, and retains the right to do so through change-in-terms repricing.

13. *Penalty-Rate Repricing.* Capital One employs the practice of "penalty-rate repricing"--sometimes called "trip-wire pricing"--under which it may unilaterally increase a cardholder's "low" and "fixed" interest rate by almost 400% as a "penalty" for his or her "default."

14. Cardholders with the lowest initial rates (e.g., 4.99%) who default may be repriced to a rate of up to 19.8%, while those with higher initial rates who default may be repriced to a rate of up to 25.9%. In some instances, Capital One applies a two-tiered repricing scheme under which a cardholder's first default may trigger repricing to an intermediate penalty rate of either 9.8% or 19.8%, while a subsequent default may trigger repricing to either 19.8% or 25.9% penalty rate.

15. Capital One's default or penalty conditions depend on the type of card. In some cases, cardholders may be held in default for making a single payment late--by even one day--exceeding their credit limit, or making a payment that is returned for any reason.

16. Capital One retains complete discretion to impose penalty rates upon defaulting cardholders, whom Capital One dubs "rule breakers." Capital One's exercise of its discretion turns on the cardholder's general credit profile, the existence and timing of the cardholder's default under *any* credit agreements with Capital One, other

8

indications of the cardholder's account usage and performance, and other considerations.

17. Capital One has dramatically increased the "fixed rate" of a substantial number of consumers as a result of penalty-rate repricing.

18. *Change-in-Terms Repricing.* Capital One also may unilaterally change a cardholder's "low" and "fixed" interest rate--for any reason or no reason at all--through the practice of "change-in-terms repricing."

19. Capital One reserves to itself this broad authority in its "Customer Agreement," an exemplar copy of which is attached hereto as Exhibit C, as follows:

> **Change In Terms.** We may amend or change any part of your Agreement, including the periodic rates…at any time….Changes to the annual percentage rate(s) will apply to your account balance from the effective date of the change, whether or not the account balance included items billed to the account before the change date and whether or not you continue to use the account.…

20. Under its change-in-terms provision, Capital One purportedly may not only unilaterally increase a cardholder's interest rate, but may then apply that higher interest rate to the cardholder's entire balance at the time of the increase, whether or not that balance includes charges incurred before the rate increase.

21. Capital One seeks to differentiate itself from its competitors by creating an impression that it is offering a credit card with "low" and "fixed" interest rates that will not increase, while the interest rates on the credit cards of other companies will inevitably increase suddenly and unexpectedly. In truth, there is no "fixed" rate on Capital One credit cards: Capital One imposes huge increases of up to four times the advertised rate on a substantial number of cardholders who are subject to its trip-wire repricing scheme, and includes in its credit card

contract a provision allowing it to raise cardholder interest rates for
any reason at any time.

22. Capital One's television advertisements are thus simply false.
Capital One's television advertisements also mislead consumers, have
the tendency and capacity to deceive consumers, or the likelihood to
create consumer confusion or misunderstanding as to the interest rate
on the credit card.

18.

In addition, the Minnesota Attorney General's Complaint alleged that

Capital One's written promotional materials touted that the fixed rates offered to

consumers were not introductory rates and that while interest rates in general

would likely go up, the rate on the offered credit card would not.

19.

Many such allegations from the Minnesota action are relevant in this

litigation, to include the following:

26. Often including the same or similar slogans and logos as those
used its television spots, Capital One's written solicitations further
create the false, deceptive and misleading impression among
Minnesota consumers that, unlike competitors' credit cards, Capital
One's credit cards have interest rates on balance transfers and/or
purchases that remain "low" and "fixed" as follows:

A.    Capital One repeatedly and prominently represents in
each solicitation that its rate is "low" and "fixed," often more than a
dozen times in each solicitation.

B.    Capital One graphically emphasizes its "low" and "fixed"
rate by setting those terms apart in different type styles, faces and

sizes, as well as in logos (e.g., "Capital One No Hassle Platinum Card" logo); icons (e.g., a bold-and-block-lettered "4.99% FIXED APR" atop an Ionic capital); and tabular boxes that compare Capital One's credit card rates and "savings" to those of competitors.

C.     Capital One states or implies that its rates will never increase by representing that interest rates "are likely to go up soon," but "the rate on this card won't;" that consumers will enjoy the benefits of the "fixed" rate "in the future," "year after year," or "for life;" that consumers will "transfer balances for the last time" to the "fixed-rate" card; and other such representations.

. . . .

28. Capital One's written marketing pieces contains no language contradicting or otherwise qualifying its false, fraudulent and deceptive representations that its interest rates remain "low" and "fixed," with the exception of a subset of fixed-rate solicitations that promote a particular "fixed" rate on balance transfers "for life" or "for the life of the balance."

20.

In 2006, Capital One entered into a settlement with the Minnesota Attorney General's office.  The terms of the settlement are not known by Plaintiffs at this time but clearly, as shown by Plaintiffs' experiences, Capital One did not end its improper practices in 2006.

21.

Similarly, in 2005, after receiving 264 complaints against Capital One, the Attorney General for the State of West Virginia filed suit against Capital One to enforce subpoenas that were issued by the Attorney General's office to explore

Capital One's improper practices regarding its credit card accounts. The suit alleged, among numerous other improprieties, that Capital One misrepresented the interest rates that would be assessed on its credit card accounts. At the time the suit was filed, the Attorney General was quoted as saying the credit card issuers "advertise low fixed rates for the life of the balance but only disclose in fine print that this is only true so long as the account remains in good standing . . . Making a single payment just one day late, going over the credit limit, or having a returned payment may put the account in bad standing."

22.

Capital One refused to make the requested disclosures, and fought the Attorney General at every turn. Just months after losing the initial court ruling, Capital One converted its bank charter to that of a national bank, thus divorcing state authorities of regulatory enforcement powers over Capital One. The federal court concluded that such conversion could successfully squelch the Attorney General's investigation.

23.

U.S. District Judge Goodwin noted, however, that he was "sympathetic" to the Attorney General "whose lawful investigation was hijacked by Capital One's conversion to a national bank." Further, the court allowed the Attorney General's

investigation to continue against Capital One Services, Inc. because it was neither a national bank nor a subsidiary of one.  The final resolution of the West Virginia proceeding against Capital One Services is not known by Plaintiffs at this time but clearly, as shown by Plaintiffs' experiences, Capital One did not end its improper practices in 2008.

24.

In 2006, California's Attorney General also began an investigation of Capital One's practices by sending various subpoenas.  He stated that he had "substantial concerns about the credit card practices of Capital One."

25.

Rather than comply with the information requests, Capital One once again argued that its new federal charter preempted the state investigation.  It filed suit in federal court to bring a halt to the Attorney General's effort.  The final resolution of the California investigation is not known by Plaintiffs at this time but clearly, as shown by Plaintiffs' experiences, Capital One did not end its improper practices in 2008.

26.

Each of the named Plaintiffs has a credit card account with Defendant and relied upon Defendant's promotional materials and/or advertising that touted

Capital One's low interest rates or fixed rates on purchases and balance transfers when they applied for their Capital One credit cards.

27.

Consumers, including Plaintiffs, reasonably rely on Capital One to ensure that their credit card accounts are maintained and operated in a good faith manner.

28.

Consumers, including Plaintiffs, were informed that they would enjoy low interest rates on their credit card balances and that the annual percentage rates associated with their credit card accounts would not increase.

29.

Capital One's recent arbitrary decision to increase annual percentage rates on existing accounts even when customers have excellent credit scores and have accounts that are in good standing demonstrates that Defendant has failed to act in good faith when maintaining and operating Plaintiffs' credit card accounts.

30.

Furthermore, Plaintiffs were not provided meaningful disclosures of the changes to the terms of their credit card accounts as required under federal and state law and their credit card account agreements.

A.    **Plaintiff Kevin S. Barker**

31.

Lieutenant Commander Barker has a credit card account with Capital One that, prior to August of 2009, had an annual percentage rate of 7.9 percent on purchases made using this credit card.

32.

At all times relevant to the factual allegations in this Complaint, Lieutenant Commander Barker's Capital One account has been in good standing.

33.

When Lieutenant Commander Barker received his August 2009 bill, he noticed that the annual percentage rate associated with his card had been increased by Capital One to 17.9 percent for purchases made using this credit card.

34.

This increased rate applied not only to new purchases made by Lieutenant Commander Barker, but also applied to the balance that existed at the time Capital One decided to unilaterally increase the annual percentage rate associated with this credit card.

35.

As a result of Capital One's decision to increase the annual percentage rate on Lieutenant Commander Barker's credit card by 10 percent, the finance charge associated with his existing balance increased over two-fold.

36.

In response to this dramatic increase in his interest rate and the fact that the increased rate was also applied to his existing balance, Lieutenant Commander Barker contacted customer service for Capital One to inquire about these developments.

37.

Lieutenant Commander Barker requested that the annual percentage rate associated with his credit card account be returned to the previous level and requested that the new annual percentage rate only be applied to new purchases, but Capital One refused to accommodate these requests.

38.

As a result of Capital One's conduct, Lieutenant Commander Barker has been forced to pay finance charges more than double the prior level even with no appreciable change to his existing balance.

**B.**    **Plaintiff Eric W. Baxter**

39.

Mr. Baxter has a credit card account with Capital One that, prior to May of 2009, had an annual percentage rate of 4.53 percent on purchases made using this credit card.

40.

At all times relevant to the factual allegations in this Complaint, Mr. Baxter's Capital One account has been in good standing.

41.

When Mr. Baxter received his May 2009 bill, he noticed that the annual percentage rate associated with his card had been increased by Capital One to 15.9 percent for purchases made using this credit card.

42.

This increased rate applied not only to new purchases made by Mr. Baxter, but also applied to the balance that existed at the time Capital One decided to unilaterally increase the annual percentage rate associated with this credit card.

43.

As a result of Capital One's decision to increase the annual percentage rate on Mr. Barker's credit card by more than 10 percent, the finance charge associated with Mr. Barker's existing balance more than tripled.

44.

In response to this dramatic increase in his interest rate and the fact that the increased rate was applied to his existing balance, Mr. Baxter contacted customer service for Capital One to inquire about these developments.

45.

Mr. Baxter requested that the annual percentage rates associated with his credit card account be returned to their previous level or a more reasonable level than 15.9 percent.   Mr. Baxter also requested that the new annual percentage rate only be applied to new purchases, but Capital One refused to accommodate these requests.

46.

As a result of Capital One's conduct, Mr. Baxter has been forced to pay finance charges roughly four times higher than he used to pay.

C.    **Plaintiff Michael A. Gaffney**

47.

Mr. Gaffney has a credit card account with Capital One that, prior to August of 2009, had an annual percentage rate of 5.3 percent on purchases and cash advances.

48.

At all times relevant to the factual allegations in this Complaint, Mr. Gaffney's Capital One account has been in good standing.

49.

When Mr. Gaffney received his August 2009 bill, he noticed that the annual percentage rate associated with his the cash advance line on his card had been increased by Capital One to 24.9 percent.

50.

This increased rate applied not only to any new cash advances that may be made by Mr. Gaffney, but also applied to the cash advance balance that existed at the time Capital One decided to unilaterally increase the annual percentage rate associated with this credit card.

51.

As a result of Capital One's decision to increase the annual percentage rate associated with the cash advance balance on Mr. Gaffney's credit card by more than 19 percent, the finance charge associated with Mr. Gaffney's existing cash advance balance increased five-fold.

52.

In response to this dramatic increase in his interest rate and the fact that the increased rate was applied to his existing cash advance balance, Mr. Gaffney contacted customer service for Capital One to inquire about these developments.

53.

Mr. Gaffney requested that the annual percentage rates associated with his cash advance line be returned to their previous level, but Capital One refused to accommodate this request.

54.

As a result of Capital One's conduct, Mr. Gaffney has been forced to pay more than five times the finance charge that he used to pay.

**D.**     **Plaintiff Rebekah L. Kautz**

55.

Ms. Kautz has two credit card accounts with Capital One.  Prior to August of 2009, one of Ms. Kautz's accounts had an annual percentage rate of 9.9 percent on purchases made using this credit card.  Prior to August of 2009, Ms. Kautz's other Capital One credit card had an annual percentage rate of 12.9 percent.

56.

At all times relevant to the factual allegations in this Complaint, both of Ms. Kautz's Capital One accounts have been in good standing.

57.

When Ms. Kautz received her August bills, she noticed that the annual percentage rate associated with each card had been increased by Capital One.  One card went from 9.9 percent to 17.9 percent for purchases.  The second card's interest rate increased from 12.9 percent to 22.9 percent.

58.

Capital One failed to provide Ms. Kautz any notice that the annual percentage rates associated with her cards were going to be increased.

59.

These increased rates applied not only to new purchases made by Ms. Kautz following the rate increases, but also applied to the balances that existed on each card at the time Capital One decided to unilaterally increase the annual percentage rates.

60.

As a result of Capital One's decision to increase the annual percentage rates on Ms. Kautz's credit cards, the finance charges associated with her existing balances increased dramatically.

61.

In response to this dramatic increase in her interest rates and the fact that the increased rates were applied to her existing balances, Ms. Kautz contacted customer service for Capital One to inquire about these developments.

62.

Ms. Kautz requested that the annual percentage rates associated with her credit card accounts be returned to their previous levels or a more reasonable level. Ms. Kautz also requested that the new annual percentage rates only be applied to new purchases. Capital One refused to accommodate these requests.

63.

As a result of Capital One's conduct, Ms. Kautz has been forced to pay substantially more in finance charges than she used to pay.

**E.    Plaintiff Richard J. Lavallie**

64.

Mr. Lavallie has a credit card account with Capital One that, prior to September of 2009, had an annual percentage rate of 7.9 percent.

65.

At all times relevant to the factual allegations in this Complaint, Mr. Lavallie's Capital One account has been in good standing.

66.

When Mr. Lavallie received his September 2009 bill, he noticed that the annual percentage rate associated with his card had been increased by Capital One to 17.9 percent for purchases made using this credit card.

67.

Mr. Lavallie did not receive any notice from Capital One informing him that the annual percentage rate associated with his card was going to be increased.

68.

This increased rate applied not only to new purchases made by Mr. Lavallie, but also applied to the balance that existed at the time Capital One decided to unilaterally increase the annual percentage rate.

69.

As a result of Capital One's decision to increase the annual percentage rate on Mr. Lavallie's credit card by 10 percent, the finance charge associated with Mr. Lavallie's existing balance more than doubled.

70.

In response to this dramatic increase in his interest rate and the fact that the increased rate was applied to his existing balance, Mr. Lavallie contacted customer service for Capital One to inquire about these developments.

71.

Mr. Lavallie requested that the annual percentage rates associated with his credit card account be returned to their previous level or a more reasonable level than 17.9 percent.   Mr. Lavallie also requested that the new annual percentage rate only be applied to new purchases, but Capital One refused to accommodate these requests.

72.

As a result of Capital One's conduct, Mr. Lavallie has been forced to pay finance charges more than two times higher than he used to pay.

**F.    Plaintiff David E. Solsberry**

73.

Mr. Solsberry has a credit card account with Capital One that, prior to August of 2009, had an annual percentage rate of 7.9 percent.

74.

At all times relevant to the factual allegations in this Complaint, Mr. Solsberry's Capital One account has been in good standing.

75.

When Mr. Solsberry received his September 2009 bill, he noticed that the annual percentage rate associated with his card had been increased by Capital One to 17.9 percent for purchases made using this credit card.

76.

This increased rate applied not only to new purchases made by Mr. Solsberry previously, but also applied to the balance that existed at the time Capital One decided to unilaterally increase the annual percentage rate associated with this credit card.

77.

As a result of Capital One's decision to increase the annual percentage rate on Mr. Solsberry's credit card by 10 percent, the finance charge associated with Mr. Solsberry's existing balance more than doubled.

78.

In response to this dramatic increase in his interest rate and the fact that the increased rate was applied to his existing balance, Mr. Solsberry contacted customer service for Capital One to inquire about these developments.

79.

Mr. Solsberry requested that the annual percentage rates associated with his credit card account be returned to their previous level or a more reasonable level than 17.9 percent.   Mr. Solsberry also requested that the new annual percentage rate only be applied to new purchases, but Capital One refused to accommodate these requests.

80.

As a result of Capital One's conduct, Mr. Solsberry has been forced to pay finance charges more than two times higher than he used to pay.

CLASS ACTION ALLEGATIONS

81.

Class Plaintiffs bring this action both individually and on behalf of all Capital One credit card account holders who incurred substantial unilateral increases to the annual percentage rates associated with their credit card accounts despite their accounts being in good standing and Capital One having no knowledge of any change to their creditworthiness.

82.

The Class of persons or entities described above is so numerous that joinder of all members by name in one action is impracticable.  All injuries sustained by any member of the Class arise out of the conduct of Defendant.

83.

Important questions of law and fact exist which are common to the entire Class and predominate over any questions that may affect individual Class Members in that Defendant has acted on grounds generally applicable to the entire Class.  It will be shown that Capital One's practice of unilaterally increasing the interest rates associated with Plaintiffs' credit card accounts was the same for millions of Capital One customers similarly situated to the named Plaintiffs.

84.

All questions as to the actions attributable to Defendant herein are similarly common. A determination of liability for such conduct will also be applicable to all members of the Class.

85.

The claims of the Class representatives, Kevin S. Barker, Eric W. Baxter, Michael A. Gaffney, Rebekah L. Kautz, Richard J. Lavallie, and David E. Solsberry are typical of the claims of the Class in that they suffered damages as a result of Defendant's bad faith and improper methods of increasing credit card interest rates, including the rate applicable to existing debt.

86.

Plaintiffs will fully and adequately represent and protect the interests of the entire Class because of the common injuries and interests of the Class Members and the uniform conduct of Defendant as to all Class Members. Plaintiffs have retained counsel competent and experienced in the prosecution of class action litigation. Plaintiffs have no interests that are contrary to or in conflict with those of the Class they seek to represent.

87.

A class action is superior to all other available methods for fair and efficient adjudication of this controversy. There is no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

88.

The prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards for Defendant under the laws alleged herein.

<u>REQUEST FOR CLASS RELIEF</u>

<u>FIRST CLAIM FOR CLASS RELIEF</u>

<u>BREACH OF CONTRACT</u>

89.

Plaintiffs incorporate by reference the allegations in Paragraphs 1-88 above as if set forth verbatim herein.

90.

Under the law of every state, the implied duty of good faith and fair dealing – or an equivalent doctrine by another name – is an element of every contract. Every contract imposes upon each party a duty of good faith and fair dealing in its

performance.  Good faith in contracting is the obligation to preserve the spirit of the bargain rather than merely the letter, the adherence to substance rather than form.  Evasion of the spirit of the bargain and abuse of a power to specify terms have been judicially recognized as examples of bad faith in the performance of contracts.

91.

Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified.  But the obligation goes further; bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

92.

Where an agreement permits one party to unilaterally determine the extent of the other's required performance, an obligation of good faith in making such a determination is implied.  Defendant has purported to reserve for itself a unilaterally ability to choose whether to increase customers' annual percentage

rates. Because Defendant sets the annual percentage rates unilaterally, Defendant has an obligation to make changes to the annual percentage rates that apply to a consumer's account in good faith. Defendant has breached this obligation and acted in bad faith by unilaterally imposing substantial increases in annual percentage rates upon consumers without any change in creditworthiness.

93.

In breach of its duties of good faith and fair dealing, Defendant has assessed excessive, unreasonable, and unnecessary interest on Plaintiffs and Class Members.

94.

Plaintiffs seek a judicial declaration determining that the charges imposed by Defendant are not consonant with Defendant's duties of good faith and fair dealing. Plaintiffs also seek compensatory damages resulting from Defendant's breach of its duties of good faith and fair dealing.

95.

Capital One's conduct has also breached the plain terms of its credit card agreements with Plaintiffs. Based upon such breach, Plaintiffs also seek compensatory damages.

31

## SECOND CLAIM FOR CLASS RELIEF

## UNCONSCIONABILITY

### 96.

Plaintiffs incorporate by reference the allegations in Paragraphs 1-88 above as if set forth verbatim herein.

### 97.

A current version of Defendant's "Customer Agreement" provides,

Changes in Terms:  We may amend or change any part of your Agreement, including the periodic rates and other changes, or add or remove requirements (including adding new requirements of the same of a different nature as the existing requirements in this Agreement) at any time.

Considering the great business acumen and experience of Defendant when compared to Plaintiffs and those similarly situated, the great disparity in their relative bargaining power, the inconspicuousness and incomprehensibility of the contract language, the oppressiveness of the terms, and the absence of a meaningful choice, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and therefore unenforceable as a matter of law.

98.

Here, Plaintiffs and those similarly situated are consumers, not bankers. Defendant does not negotiate these terms with any customers. Plaintiffs, like most consumers, were not in a position to bargain for more favorable contract terms, nor were they able to experience the results of Capital One's practices before enrolling in Capital One's services. With regard to the "surprise factor," Plaintiffs and those similarly situated were not made aware of Defendant's practices at the time the contract was entered into.

99.

Plaintiffs request an inquiry into the setting, purpose, and effect of these terms, including the basis and justification for the unilateral increases in annual percentage rates. The credit card industry should not be immune from scrutiny. Combined with the absence of meaningful choice, the lack of sophistication of consumers, and Capital One's questionable marketing, the Court should strike down Capital One's practices as unconscionable.

100.

Capital One has structured totally one-sided transactions. The absence of equality of bargaining power, open negotiation, full disclosure, and a contract which fairly sets out the rights and duties of each party demonstrate that the

transaction lacks those checks and balances which would inhibit the unilateral changing of interest rates. Each rate increase imposed by Capital One should be rescinded and Plaintiffs and those similarly situated be refunded the excess interest paid to Defendant.

THIRD CLAIM FOR CLASS RELIEF

UNJUST ENRICHMENT

101.

Plaintiffs incorporate by reference the allegations in Paragraphs 1-88 above as if set forth verbatim herein.

102.

By means of Capital One's improper conduct as alleged herein, Defendant knowingly imposed interest rate and required payment increases on Plaintiffs and members of the Class that are unfair, unconscionable, and oppressive.

103.

Capital One knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Class. In so doing, Defendant acted with conscious disregard for the rights of Plaintiffs and members of the Class.

104.

As a result of Capital One's unlawful conduct as alleged herein, it has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

105.

Capital One's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

106.

Under the common law doctrine of unjust enrichment, it is inequitable for Capital One to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of improper interest rate increases on Plaintiffs and members of the Class in an unfair, unconscionable, and oppressive manner.  Capital One's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

107.

The financial benefits derived by Capital One rightfully belong to Plaintiffs and members of the Class.  Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the Class all unlawful or inequitable proceeds received by them.  A constructive trust should be imposed

upon all unlawful or inequitable sums received by Capital One traceable to Plaintiffs and the members of the Class.

108.

Plaintiffs and members of the Class have no adequate remedy at law.

WHEREFORE, Plaintiffs Kevin S. Barker, Eric W. Baxter, Michael A. Gaffney, Rebekah L. Kautz, Richard J. Lavallie, David E. Solsberry, and the numerous Currently Unnamed Plaintiffs pray:

(1)    For certification of this matter as a class action lawsuit to proceed on behalf of the class of all Currently Unnamed Plaintiffs as defined after suitable initial discovery has been completed;

(2)    For restitution;

(3)    For an award of such damages as are authorized by law;

(4)    For an award of all reasonable costs and attorneys' fees;

(5)    For trial by jury of all matters; and

(6)    For such other and further relief as the Court may deem just and equitable.

DATED this 12th day of November, 2009.

Respectfully submitted,

BY:   WEBB, KLASE & LEMOND, LLC

  s/ E. Adam Webb
E. Adam Webb
  Georgia State Bar No. 743910
G. Franklin Lemond, Jr.
  Georgia State Bar No. 141315

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
(770) 444-0271 (fax)
Adam@WebbLLC.com
FLemond@WebbLLC.com

Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 12, 2009, I presented the foregoing to the

Clerk of Court for filing and uploading to the CM/ECF system, which will send a

notice to the counsel of record listed below:

H. Wayne Phears, Esq.
McGuire Woods LLP
1170 Peachtree Street, N.E.
Suite 2100
Atlanta, Georgia 30309

DATED this 12th day of November, 2009.

 s/ E. Adam Webb
E. Adam Webb