IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| IN RE: CAPITAL ONE BANK CREDIT CARD INTEREST RATE LITIGATION | MDL DOCKET NO. 2171 ALL CASES |
|---|---|
| | 1:10-md-02171-TWT |

**OPINION AND ORDER**

This matter is before the Court on the Defendant's motion for summary judgment [Doc. 48].

**I. Background**

**A.      Procedural History**

This multidistrict litigation and purported class action stems from the Defendant Capital One's decision to raise interest rates on customers' credit card accounts in 2009. The Plaintiffs allege a multitude of claims, including breach of contract; breach of implied contract; unconscionability; unjust enrichment; and violations of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*; the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*; the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; the California False Advertising Act, Cal. Bus. & Prof. Code § 17500 *et seq.*; the Kansas Consumer Protection Act, K.S.A. 50-623; and the

New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 *et seq.*

The Plaintiffs Barker, Baxter, Gaffney, and Kautz filed their original complaint against Capital One in state court on September 15, 2009. Capital One removed that suit to federal court on September 30, 2009 in a case styled as *Barker v. Capital One Bank (USA), N.A.*, Civil Action No. 1:09-CV-2682, N.D. Ga. After removal, the complaint was amended to add the Plaintiffs Solsberry and Lavallie. The Plaintiffs Mancuso and Roberti filed their complaint against Capital One on April 2, 2010, in the United States District Court for the Eastern District of Virginia in a case styled *Mancuso v. Capital One Bank (USA), N.A.*, Civil Action No. 1:10-CV-326, E.D. Va. The Plaintiff Kolkowski filed her complaint against Capital One on May 10, 2010, in the United States District Court for the Central District of California in a case styled as *Kolkowski v. Capital One Bank (USA), N.A.*, CV10-3486, C.D. Cal. On June 11, 2010, the cases were consolidated in the multidistrict litigation, *In re: Capital One Credit Card Interest Rate Litigation*, MDL No. 2171.

In earlier proceedings during this litigation, the Court provided the Plaintiffs with the opportunity to file a consolidated amended complaint. *See* Docket Entry [8], Transcript, July 14, 2010, at 15, 25-26.[1] The Court also ruled that the Defendant

---

[1]     This case was originally presided over by the Honorable J. Owen Forrester. On April 1, 2014, the case was transferred to the undersigned. *See* Docket Entry [129].

would be permitted to file a dispositive motion as to certain legal issues (federal causes of action and breach of contract) before any matters of class certification or state consumer protection laws were addressed.[2]  In a later conference, however, the Defendant asked the Court to revisit its decision to put off consideration of state consumer protection claims.[3]  The Court agreed that it would consider all federal and state law claims when the Defendant filed its dispositive motion.[4]

The Defendant filed a motion for summary judgment on August 8, 2011.  As the Court has previously explained, however, briefing of this motion was substantially delayed by discovery disputes between the parties that were eventually referred to Special Master Jeffrey Bramlett.  Special Master Bramlett issued a Report and Recommendation that required disclosure of certain documents.  The parties had previously agreed to accept the ruling of the Special Master without further objection.

After the Special Master issued his Report, the parties filed additional briefing on the Defendant's motion for summary judgment supplemented by the additional documents disclosed.  *See* the Plaintiffs' Supplemental Brief, Docket Entry [115]; the Plaintiffs' Updated Response to Defendant's Statement of Material Facts, Docket

---

[2]  *Id.* at 18, 21, 22.

[3]  *See* Transcript (Rough Draft), June 29, 2011.

[4]  *Id.* at 5.

Entry [124]; the Plaintiff's Updated Statement of Material Facts Docket Entry [125];

the Defendant's Reply Brief, Docket Entry [127]; and the Defendant's Response to

Plaintiffs' Updated Statement of Material Facts, Docket Entry [128].[5] The Defendant's

motion for summary judgment is now fully briefed.

### B. Facts

The Defendant is a national bank, organized under the National Bank Act,

which offers credit cards to consumers. Consumers who hold a Capital One credit

card typically have responded to direct mail, internet, or other form of solicitation

from Capital One to apply for a credit card.[6] These solicitations offer a wide variety

of terms, including "fixed rate" and "variable rate" credit cards. Generally, after

Capital One approves a credit card application, it mails out the credit card. Within

several days, Capital One also mails the new account holder a Customer Agreement

in effect at that time.[7] Further, in the 2009 time period, the back of Capital One credit

---

[5]     These updates replace the Plaintiffs' Statement of Additional Undisputed
Material Facts, Docket Entry [55]; the Plaintiffs' Response to Defendant's Statement
of Material Facts, Docket Entry [56]; and the Defendant's Response to Plaintiffs'
Additional Material Facts, Docket Entry [70]. The Court does not refer to these
documents in its analysis.

[6]     *See* Docket Entry [56], Exhs. 1 and 2 (representative sample of such
solicitations).

[7]     The Plaintiffs object to Defendant's use of the declaration of Brad
Jiulianti, Senior Business Director for Capital One Services, LLC, to support this
contention. The Plaintiffs argue there are others in the corporation more suitable to

cards stated: "By accepting, signing or using this card, you agree to Capital One's present and future rules and regulations."[8]

Capitol One on occasion amends its Customer Agreement. The Customer Agreement in effect during the 2009 time period was the 2005 Customer Agreement. For those Plaintiffs who had an account prior to 2005, the 2005 Customer Agreement was mailed to them at the time it went into effect. For those Plaintiffs who opened accounts after 2005, the 2005 Customer Agreement was mailed to them at the time they opened their accounts. The 2005 Customer Agreement was not amended until 2010, and that amendment has no impact here.

The 2005 Customer Agreement states that the account holder's contract with Capital One consists of the:

> Customer Agreement, together with any changes to this Customer Agreement that we make as provided below, the Security Account (if applicable), the Security Account Assignment Agreement (if applicable), Capital One Privacy Notice, any account disclosures provided and delivered to you prior to or at the time your account opened, including disclosures pursuant to requirements of Truth in Lending Act . . ., as well as any subsequent notices of changes to these documents, and any and

provide such testimony. These statements of fact are in the nature of providing context. Furthermore, the Court may consider such testimony so long as it could be reduced to admissible evidence at trial. Since the Plaintiffs do not dispute the testimony, but rather its source, the Court concludes that at trial, another representative of Capital One could testify as to these procedures.

[8] *See* Jiulianti Decl., ¶ 14.

all documents that include your signature (including any electronic or digital signature) on any application, sales slip or other evidence of indebtedness on your account.[9]

The 2005 Customer Agreement also contains an "Account Closure and Suspension of Credit Privileges" clause, which provides:

**Account Closure and Suspension of Credit Privileges**. (1) We may, at any time, with or without cause, with or without advance notice, and regardless or the existence or non-existence of a default under this Agreement, cancel the account . . .[10]

The 2005 Customer Agreement contains a "Changes in Terms" clause, which provides:

**Changes In Terms.** We may add to, remove, amend or change any part or provision of this Agreement, including the annual percentage rate(s) and any charges, (including adding new provisions of the same or a different nature as the existing provisions in this Agreement) at any time. If we do so, we will give you notice of such amendment or change if required by Federal law or Virginia law (to the extent not preempted by Federal law) unless we had previously notified the customer that the account would be subject to such amendment or change without notice. Notice will be mailed to the last billing address indicated in our records for the account. However, no notice will be mailed if we previously had notified you that your account would be subject to such amendment or change without notice. Changes to the annual percentage rate(s) will apply to your existing account balance from the effective date of the change, whether or not the account balance includes transactions billed to the account before the change date and whether or not you continue

---

[9]    *See* 2005 Customer Agreement, at 1 (attached to Jiulianti Decl, ¶ 20 & Exh. A-1).

[10]    *Id.* at 2.

to use the account. Changes to fees and other charges will apply to your account from the effective date of the change.[11]

For the purpose of providing context, witnesses in the case will often refer to Changes in Terms as "CIT." The 2005 Customer Agreement contains a choice of law provision which states the contract "will be governed only by Federal law and Virginia law (to the extent not preempted by Federal law)."[12]

In late 2008, Capital One decided to increase the annual percentage rate ("APR") applicable to the accounts of certain customers, including the Plaintiffs, as part of a 2009 "repricing" program. This program is sometimes referred to as the 2009 CIT, or 2009 Change in Terms. On other occasions, the company referred to it as "NCR" or noncontractual repricing. The 2009 Change in Terms changed customers' purchase interest rates, cash interest rates, penalty interest rates, and credit limits. Over 30 million customers were "repriced" during the 2009 Change in Terms which occurred in two phases. The first group of accounts was selected for repricing in February 2009, the second in May 2009.

The 2009 Change in Terms excluded certain accounts, including:

---

[11] *Id.*

[12] *Id.* California residents received a different version of the 2005 Customer Agreement, but the California agreement contained the relevant provisions quoted above.

- accounts opened less than 12 months before 2009 Change in Terms would take effect;
- accounts promised a "Fixed for Life" APR;
- customers who had promises made specifically in their solicitations that were still enforceable at the time of the 2009 Change in Terms;
- accounts located in the newly-acquired Chevy Chase Bank geographic footprint;
- closed accounts;
- accounts that had restricted charging privileges;
- accounts with spending activities more than $30,000 per year;
- accounts associated with customers who had more than $50,000 in deposits in Capital One banking institutions; and
- accounts in Puerto Rico.[13]

As the Plaintiffs note, the implementation of these exemptions was not without error.

In the account records for each affected customer, Capital One noted if the account was designated for repricing in the 2009 Change in Terms.[14] Attached to Jiulianti's declaration are screen shots from each of the Plaintiff's accounts which show that his/her account was selected for inclusion in the 2009 Change in Terms.[15]

Capital One developed a procedure to send notice of the 2009 Change in Terms

---

[13] *See* Jiulianti Decl., ¶ 28.

[14] *Id.*, ¶ 31.

[15] The Plaintiffs "dispute" this fact by stating that Capital One's account records do not reflect this for Lavallie, Solsberry, Roberti, Kautz, Mancuso, and Kolkowski. The only citation for this response, however, is the depositions of those individuals. The depositions contest whether these six individuals ever received notice of the 2009 Change in Terms, but do not address what might be reflected in Capital One's account records for these individuals. Therefore, the Court finds this statement undisputed.

to the affected customers. Capital One created several different "templates" for the notices, each of which was assigned a different "Offer ID number." The Offer ID number corresponded to the specific repricing change that would affect that group of customers.

Capital One contracted with third-party vendor R.R. Donnelly to mail the notices in two batches, one in February 2009 and one in May 2009. The notices were mailed to each customer using the addresses listed in Capital One's account records. The envelope containing the notice stated: "IMPORTANT INFORMATION REGARDING YOUR ACCOUNT." The notice generally informed customers of the proposed changes to the annual percentage rate, the effective date of these changes, and the opportunity to decline the changes.

Lisa Gaylor, Principal Production Manager for Capital One Services, LLC, provided a declaration describing the mailing process. Gaylor worked as the "point person" between Capital One and R.R. Donnelly on the February 2009 mailing.[16]

_____

[16] The Plaintiffs object to portions of Gaylor's testimony stating that she could not have personal knowledge of R.R. Donnelly's mail facility in Green Bay, Wisconsin because she was not at the mail facility. The Court makes no comment on the viability of such a complaint in the hearsay context. Rather, the Court notes only that the Plaintiffs do not dispute the substance of Gaylor's testimony and there is no information before the Court that the Capital One and R.R. Donnelly employees present at the mail facility would not be available at trial to testify as to the same substance. Therefore, because the Court finds that the testimony could be reduced to admissible evidence at trial, the Court may consider it now even if it is hearsay.

R.R. Donnelly's facilities allow for "in-line" printing which means that the notice and envelope are processed on one line eliminating the need for another additional machine or person to "stuff" the envelope. Capital One sent an employee to R.R. Donnelly's mail facility in Green Bay, Wisconsin to oversee the February and May 2009 mailings. Capital One provided R.R. Donnelly with an electronic list of those customers who would be subject to the 2009 Change in Terms. When R.R. Donnelly received Capital One's list of customers, it printed the notices and envelopes which were then sorted by zip code and put on pallets for mailing.[17] A U.S. Postal Service facility is located within the R.R. Donnelly mail facility where the notices were printed. The notices were placed on pallets which were then given over to the custody of the U.S. Postal Service.

Each Change in Terms notice was mailed via first class mail. The U.S. Postal Service facility in Wisconsin provided to R.R. Donnelly periodic postal receipts in February and May 2009 to show that the number of notices received by the U.S. Postal Service matched the number Capital One requested that R.R. Donnelly print. For the February 2009 mailing, Capital One intended to send 23,862,852 notices and R.R. Donnelly's mailing receipts show that 23,862,852 notices were mailed from the

---

[17]     Without specification, the Plaintiffs contend that this portion of Gaylor's declaration differs from her deposition testimony. The Court has reviewed the cited portion of Gaylor's deposition and does not discern any material inconsistencies.

Post Office in the R.R. Donnelly facility.[18]  For the May 2009 mailing, 11,110,906

notices were printed and 11,110,906 were mailed.[19]  There was, however, no

reconciliation of individual names on mailings with names on accounts.[20]

The notices mailed in February 2009 gave account holders until April 17, 2009,

to contact Capital One to opt out of the Change in Terms.  The May 2009 notices gave

account holders until July 28, 2009, to contact Capital One to opt out of the Change

in Terms.  Generally, once those deadlines passed, customers were not permitted to

opt out of the Change in Terms.  However, sometimes if a customer complained, he

would be permitted to opt out after those deadlines.[21]  These notices were mailed prior

to August 22, 2009, the effective date of the Credit Card Accountability

Responsibility and Disclosure ("Credit CARD") Act which changed certain disclosure

requirements credit card companies had to make to their consumers.

Jiulianti testified that when an explicit promise had been made to a customer

concerning how long a "fixed" rate would last, Capital One intended to exclude them

---

[18]     *See* Gaylor Supp. Decl. ¶¶ 9-22 (attached at Docket Entry [69], Exh. Z).
Gaylor testified that these receipts were produced during discovery in this litigation.
*See* Gaylor Supp. Decl., ¶ 9.

[19]     *Id.*, ¶¶ 23-24.

[20]     *See* Gaylor Depo., at 14-15.

[21]     *See* Pls.' Resp., SMUF, ¶ 46.

from the 2009 Change in Terms.[22]  Jiulianti also recognized that the company had

made an "internal commitment" to keeping customers' rates at "fixed" for three

years.[23]  This was not an external promise, however, and those customers could be

"repriced" but Capital One attempted to "delay" the impact of the "repricing" on these

customers.[24]

## 1. __Barker Facts__[25]

---

[22]     *See* Jiulianti Rule 30(b)(6) Depo., at 110-20.

[23]     *Id.*

[24]     *Id.*

[25]     Throughout the Defendant's Statement of Material Undisputed Facts, the Plaintiffs dispute portions of the testimony of the Defendant's Rule 30(b)(6) deponent Brad Jiulianti as not having been made on the basis of personal knowledge.  As to the Plaintiffs' account records, Jiulianti would not need to have personal knowledge.  In *United States v. Langford*, 647 F.3d 1309 (11th Cir. 2011), the defendant argued that the district court had improperly admitted certain credit card records under the "business records" hearsay exception Federal Rule of Evidence 803(6).  The defendant argued – just as the Plaintiffs here do – that the proffered custodial witness was not sufficient because she did not have personal knowledge of each of the records. *Id.* at 1326.

The Court of Appeals first recounted the "business records" exception, which provides that the following documents are admissible:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, ... unless the source of information or the method or circumstances of preparation indicate lack of

In 2003, Capital One offered Barker a fixed APR of 0% on balance transfers

until April 2004 and a fixed APR of 9.9% thereafter, as well as a fixed APR of 0% on

---

trustworthiness.

*Id.* (quoting Fed. R. Evid. 803(6)). The court then pointed to the advisory committee's note for Rule 803(6), as clarified by the 1974 amendment:

> It is the understanding of the committee that the use of the phrase "person with knowledge" is not intended to imply that the party seeking to introduce the memorandum, report, record, or data compilation must be able to produce, or even identify, the specific individual upon whose first-hand knowledge the memorandum, report, record or data compilation was based. A sufficient foundation for the introduction of such evidence will be laid if the party seeking to introduce the evidence is able to show that it was the regular practice of the activity to base such memorandums, reports, records, or data compilations upon a transmission from a person with knowledge....

*Id.* at 1326-27 (quoting Fed. R. Evid. 803 advisory committee's note). The court found the Government had laid a sufficient foundation for the business records exception where the bank's custodian testified that while she did not have personal knowledge of the contents of the documents, she had personal knowledge of the process that was involved in gathering the documents from the ongoing business at the bank and that the documents were contemporaneously made and held in the normal course of business. *Id.* at 1327.

Even a step further, the Eleventh Circuit has held that it "is not essential that the offering witness be the recorder or even be certain of who recorded the item. It is sufficient that the witness be able to identify the record as authentic and specify that it was made and preserved in the regular course of business." *United States v. Atchley*, 699 F.2d 1055, 1058 (11th Cir. 1983); *see also United States v. Darling*, 396 Fed. App'x 607, 616 (11th Cir. 2010) (per curiam) (unpublished opinion) (court properly admitted as business record form automatically generated by bank to flag questionable transactions and upon which unknown bank employees made handwritten notes during course of their investigation).

Here, Jiulianti testified that he made the declaration based both on his "personal knowledge" and his "review of the relevant records." *See* Jiulianti Decl., ¶ 4. The Court finds this sufficient in light of *Langford*, *Atchley*, and *Darling*.

purchases through his April 2004 billing period and a fixed APR of 9.9% on purchases thereafter. Barker accepted this offer and has held this Capital One card from November 28, 2003 to date, although it has had two different account numbers. The 2003 Customer Agreement apparently is not in the record, but Barker would have been mailed a 2005 Customer Agreement at some point in 2005.[26]

Barker could not recall whether he responded to a specific solicitation in getting his Capital One credit card in 2003.[27] Thus, there is no information in the record that Barker ever received a "fixed for life" offer.[28] Barker testified that he "understood" that his rate would remain "fixed" at 7.9%.[29] Barker believed that Capital One would "keep [his] rate at that level unless [he] violate[d] the terms of the agreement."[30]

The 0% promotional fixed APR for purchases remained in effect until April 8, 2004 when the APR switched to a 9.9% fixed rate. On July 8, 2005, the APR for purchases changed to a fixed rate of 14.9%. In April 2007, the default APR changed to a variable rate of 28.15%. On May 8, 2007, the APR for purchases changed to a

---

[26]    *See* DSMUF, ¶ 54.

[27]    *See* DSMUF, ¶¶ 51-52.

[28]    *See* DSMUF, ¶¶ 49-50.

[29]    *See* Barker Depo., at 17.

[30]    *Id.* at 66.

fixed rate of 7.9%.[31]

Barker's account was part of the 2009 Change in Terms. Capital One mailed to Barker a notice of the repricing on May 12, 2009. Specifically, the notice informed Barker that the terms of the account for (1) purchase and balance transfer rate and (2) cash advance rate, were changing.[32] It further stated that the changes to the "Annual Percentage Rates (APRs) would be effective for all billing periods that begin after July 2, 2009."[33] For Purchase and Balance Transfer APR:

> Your new rate for all balances subject to the Purchase and Balance Transfer rate is 17.9%. . . . This is a variable rate, determined by adding 14.65% to the Prime rate. Please note that this rate does not affect any special transfer, introductory or promotional rates unless or until they expire.[34]

The Notice went on to state that "[y]ou can choose to decline the changes to your rates and close your account."[35] "If you decline, we will close your account on August 2,

---

[31]    *See* DSMUF, ¶ 55. The Plaintiffs deny this statement, but their denial focuses not on the fact of the rate changes, but rather on whether Barker would have "noticed" these changes or whether he carried any balance on the card at the time these changes were made. *See* Pls.' Resp., ¶ 55. The Court finds, therefore, that the Plaintiffs have not provided record evidence to dispute the fact of the rate changes.

[32]    *See* Def.'s Exh. A-5, at 1.

[33]    *Id.* at 2.

[34]    *Id.*

[35]    *Id.* at 4 (explaining how to decline and close account).

2009. . . . If you decline, you will be able to pay down your balance at your existing terms. Please keep in mind that any transactions you make prior to August 2, 2009 will still post to your account."[36]

Barker testified that he received this notice, but that he understood the notice to mean that the increased interest rate would apply to future purchases and not to existing balances.[37] Barker did not opt out and decline these changes. Barker's account is scheduled to close when he pays off the remaining balance.[38]

Barker testified that when he received the notice, he decided to stop using the card and just pay off his existing balance at the old rate.[39] He did not realize that the higher interest rate had been applied to his existing balance until he opened his August 2009 account statement.[40] He called then to opt-out, but Capital One told him he could not.[41] Barker closed the account and is paying off the balance at the higher

---

[36]     *Id.*

[37]     *See* Pls.' Resp., ¶ 57, Barker Depo., at 8.

[38]     *See* DSMUF, ¶ 61.

[39]     *See* Barker Depo., at 34.

[40]     *Id.* at 40.

[41]     *Id.* at 40-41.

rates.[42]  This has increased his monthly payments by approximately $100 per month.[43]

### 2.    Baxter Facts

In 2005, Capital One offered Baxter a fixed APR of 0% on purchases through December 2006 and a variable APR tied to the London Interbank Offered Rate ("LIBOR") on purchases thereafter.  Baxter did not receive a "fixed for life" offer and understood that he did not have a fixed rate.  Baxter also could not identify a specific solicitation to which he responded, but rather stated that Capital One's "no hassle" advertisements convinced him to apply for a Capital One credit card.  Under Capital One's general procedures, after Baxter opened his account, he would have been sent the 2005 Customer Agreement in effect at the time.

The promotional fixed APR rate of 0% on purchases continued through December 13, 2006, when the APR for purchases switched to a variable rate of 9.45%. From this point until the 2009 Change in Terms, Baxter's rate varied from 4.53% to 9.89%.[44]  In April 2007, the default APR on Baxter's account changed to a variable

---

[42]    *Id.*

[43]    *Id.* at 72-73.

[44]    The Plaintiffs attempt to deny this fact by stating "Capital One fails to properly describe the tie of Mr. Baxter's account to the LIBOR."  *See* Pls.' Resp., ¶ 69.  This statement is meaningless to the Court and particularly puzzling in light of the fact that the Plaintiffs, themselves, noted that Baxter's interest rate was tied to the

rate of 28.15%.

Baxter's Capital One account was part of the 2009 Change in Terms. Baxter received Notice of the 2009 Change in Terms around February 2, 2009. The Notice informed Baxter that the terms of the account for (1) purchase and balance transfer rate, (2) cash advance rate, and (3) default rate, were changing.[45] It further stated that the changes to the "Annual Percentage Rates (APRs) would be effective for all billing periods that begin after April 17, 2009."[46] For Purchase and Balance Transfer APR:

> A variable rate equal to 15.9% . . . as of January 28, 2009. Your purchase and balance transfer APR may vary monthly. The rate will be determined by adding 12.65% to the Prime rate. . . . Please note that this change impacts balances transferred at the Purchase rate, but does NOT affect any Special Transfer rates.. . . Any introductory or promotional rates on your account will not increase until they expire.[47]

The Notice went on to state that "[y]ou can choose to decline this change and close your account."[48] "If you decline, we will close your account on May 17, 2009. . . . If you decline, you will be able to pay down your balance at your existing terms. Please

---

LIBOR. *See* Pls.' Resp., ¶ 63.

[45]    *See* Def.'s Exh. A-8, at 1.

[46]    *Id.* at 2.

[47]    *Id.* (noting similar changes in terms for the Cash Advance and Default APRs).

[48]    *Id.* at 4 (explaining how to decline and close account).

keep in mind that any transactions you make prior to August 2, 2009 will still post to your account."[49]   Baxter did not decline the Change in Terms.[50]

Baxter testified that he did receive notice of the Change in Terms, but believed that the increased rates would apply only to purchases made after April 17, 2009.[51] He did not learn that his interest rate had increased on existing balances until he received his next statement.[52]

### 3.   Gaffney Facts

Gaffney opened his Capital One account on July 14, 1993 and has had his account since then.  Due to the age of the account, only those statements from 2000 forward are available.  Gaffney, however, testified that he could not recall any particular solicitation that led to him apply for a Capital One credit card and that he understood his rate could vary over time.[53] In his supplemental response to the Defendant's interrogatories, Gaffney stated that he was "enticed" by several promotional checks from Capital One in January and March 2009 which caused him

---

[49]   *Id.*

[50]   *See* DSMUF, ¶ 74 & Resp.

[51]   *See* Baxter Depo., at 33-34.

[52]   *Id.* at 69.

[53]   *See* Gaffney Depo., at 35-36.

to transfer his other credit card balances to his Capital One account.[54]  In accordance with Capital One's practices, Gaffney would have been mailed a 2005 Customer Agreement shortly after its terms became effective.[55]

From October 20 to November 19, 2000, the APR for cash advances on Gaffney's account was a variable rate of 19.9%.[56]  On November 20, 2000, the APR for cash advances on Gaffney's account changed to a fixed rate of 9.9%.[57]  In April 2007, the default rate changed to a variable rate of 28.15%.[58]  On August 26, 2007, the APR for cash advances changed to a variable rate of 22.99%.[59]  On September 26, 2007, the APR for cash advances changed to a variable rate of 9.9%.[60]

Gaffney's account was part of the 2009 Change in Terms.  Jiulianti testified that Gaffney's account records show that on May 12, 2009, he was mailed a Notice with an Offer ID No. 15488.[61]  Gaffney's account records reflect an address in East

---

[54]     *See* DSMUF, ¶ 76.

[55]     *See* DSMUF, ¶ 79 & Resp.

[56]     *See* DSMUF, ¶ 80.

[57]     *Id.*

[58]     *Id.*

[59]     *Id.*

[60]     *Id.*

[61]     *See* Jiulianti Decl., ¶ 93 (citing Exh. A-9, at 40).

Longmeadow, Massachusetts. No. 15488 matches the notice number on the Defendant's Exh. A-11. The Notice states that it is providing information on a Change in Terms for the Cash Advance Rate.[62] Beginning for all billing periods after July 2, 2009, "[y]our new rate for all balances subject to the Cash Advance rate is 24.9% . . . This is a variable rate, determined by adding 21.65% to the Prime rate."[63] The Notice went on to state that "[y]ou can choose to decline this change and close your account."[64] "If you decline, we will close your account on August 2, 2009. . . . If you decline, you will be able to pay down your balance at your existing terms. Please keep in mind that any transactions you make prior to August 2, 2009 will still post to your account."[65] Gaffney did not decline the Change in Terms.[66]

Gaffney testified that he did receive notice of the 2009 Change in Terms, but with regard to his purchase and balance transfer rates only.[67] He determined that he would not use his card for purchases so he did not feel the need to call and opt out.[68]

---

[62] *See* Exh. A-11, at 1.

[63] *Id.* at 2.

[64] *Id.* at 4 (explaining how to decline and close account).

[65] *Id.*

[66] *See* DSMUF, ¶ 86 & Resp.

[67] *See* Gaffney Depo., at 37-38, 58.

[68] *Id.* at 29-31.

Gaffney testified that he did not receive a notice concerning an increase in his cash advance rate.[69] Gaffney testified that he did call Capital One in August when he saw that the cash advance rate had increased to 24.9%.[70] He asked that his cash advance rate be lowered and Capital One declined to do so.[71]

### 4. **Kautz Facts**

In 2003, Capital One offered Kautz, neé Casanova, a fixed APR of 0% on balance transfers and purchases through her October 2003 billing period and a fixed APR of 14.9% on balances and transfers thereafter (for account ending -2600). Kautz has had her credit card with Capital One from May 3, 2003 to date. Capital One mailed Kautz a 2005 Customer Service Agreement shortly after it took effect.[72]

In 2003, Capital One also offered Kautz a credit card with a fixed APR of 0% on purchases through her February 2004 billing period and a fixed APR of 14.9% on purchases thereafter (for account ending -8899). Kautz has had that card from July 20, 2003 to date. Capital One mailed Kautz a 2005 Customer Service Agreement

---

[69]   *Id.* at 58.

[70]   *See* Gaffney Depo., at 42.

[71]   *Id.* at 42-43.

[72]   *See* Jiulianti Decl., ¶¶ 106-07.

shortly after it took effect.[73]

For account ending -2600, the 0% fixed APR for purchases lasted until October 20, 2003 when it switched to a 14.9% fixed rate. On October 20, 2004, the APR for purchases changed to a fixed rate of 12.9%.

For account ending -8899, the 0% fixed APR for purchases lasted until October 20, 2003 when it switched to a 12.9% fixed rate. On May 24, 2004, the APR for purchases changed to a fixed rate of 9.9% and on June 24, 2004, the APR for cash advances changed to a variable rate of 19.99%.

Kautz testified that she understood that Capital One had the authority to change the interest rate but had she received notice of the rate change, she would have closed the account.[74] She did not think it was right that Capital One doubled her interest rates because her accounts had been in good standing and she did not have any late fees.[75] Kautz did not retain any of the solicitations upon which she relied when she decided to apply for credit cards with Capital One.

Both of Kautz's accounts were part of the 2009 Change in Terms. Jiulianti testified that for the account ending -2600, a notation in the account statement shows

---

[73]    *See* Jiulianti Decl., ¶¶ 113-14.

[74]    *See* Kautz Depo., at 25.

[75]    *Id.* at 24.

that a Notice ID No. 15426 was mailed on May 12, 2009.[76]  For account ending -

8899, a Notice ID No. 15468 was mailed on May 12, 2009.[77]  Notice ID No. 15426

is attached to the Jiulianti Declaration as Exh. A-14 and Notice ID No. 15468 is Exh.

A-17.[78]

Notice ID No. 15426 informed Kautz that the terms of the account for (1)

purchase and balance transfer rate, (2) cash advance rate, and (3) default rate, were

changing.[79] It further stated that the changes to the "Annual Percentage Rates (APRs)

would be effective for all billing periods that begin after July 2, 2009."[80] For Purchase

and Balance Transfer APR:

> Your new rate . . . is 22.9% . . . This is a variable rate, determined by
> adding 19.65% to the Prime Rate.  Please note that this rate does not
> affect any special transfer, introductory or promotional unless they
> expire.[81]

---

[76]     *See* Jiulianti Decl., ¶¶ 120-21 (citing Exh. A-12, at 40).

[77]     *Id.*, (citing A-15, at 33).

[78]     Jiulianti testified that the format of Exhibits A-14 and A-17 that Kautz
received in the mail would be different than those presented in the Defendant's
exhibits but the content was the same.  *See* Jiulianti Decl., ¶ 121 & n.14.

[79]     *See* Def.'s Exh. A-14, at 1.

[80]     *Id.* at 2.

[81]     *Id.* (noting similar changes in terms for the Cash Advance and Default
APRs).

The Notice went on to state that "[y]ou can choose to decline this change and close your account."[82] "If you decline, we will close your account on August 2, 2009. . . . If you decline, you will be able to pay down your balance at your existing terms. Please keep in mind that any transactions you make prior to August 2, 2009 will still post to your account."[83] Kautz did not decline the Change in Terms.[84]

Notice ID No. 15468 informed Kautz that the rates for Purchase and Balance Transfers and Cash Advances would be changing.[85] The new Purchase and Balance Transfers rate would be a variable rate at 17.9% and Cash Advance rate would also be variable and at 24.9%.[86] The Notice went on to state that "[y]ou can choose to decline this change and close your account."[87] "If you decline, we will close your account on August 2, 2009. . . . If you decline, you will be able to pay down your balance at your existing terms. Please keep in mind that any transactions you make prior to August 2, 2009 will still post to your account."[88] Kautz did not decline the

---

[82] *Id.* at 4 (explaining how to decline and close account).

[83] *Id.*

[84] *See* DSMUF, ¶ 129 & Resp.

[85] *See* Def.'s Exh. A-17, at 1.

[86] *Id.*

[87] *Id.* at 4 (explaining how to decline and close account).

[88] *Id.*

Change in Terms.[89]

Jiulianti testified that these notices were mailed to the Derby, Kansas address on Kautz's accounts.[90]  Kautz testified that she did not receive notice of the Change in Terms.[91]  When Kautz learned of the increased rates by looking at her August 2009 statements, she called Capital One to close the accounts.[92]

### 5. Lavallie Facts

Lavallie opened his credit card account with Capital One on March 6, 1999.[93] Lavallie did not receive a fixed "for life" purchase APR offer on his Capital One credit card account.[94]  Lavallie could not recall specifically what advertisement

---

[89]     *See* DSMUF, ¶ 129 & Resp.

[90]     *See* Jiulianti Decl., ¶¶ 123-25.

[91]     *See* Kautz Depo., at 23, 55.

[92]     *Id.* at 27, 36, and 66.

[93]     *See* DSMUF, ¶ 110.

[94]     *See* DSMUF, ¶ 107. As with many other the Plaintiffs, Lavallie attempts to dispute this fact by stating "[w]hile the catch phrase 'for life' was never used, Captain Lavallie's account terms were such that, so long as he did not violate the terms of his credit card agreement, Capital One would continue to honor its end of the bargain by loaning him money at the previously agreed rate."  *See* Resp., ¶ 107.  The Court cannot discern the legal significance of this statement in terms of "honor its end of the bargain."  It certainly does not dispute the Defendant's statement of fact that Lavallie was not given a "fixed for life" offer on APR for this credit card.  Further, Lavallie does not point to any specific contractual provision which provides that the terms of the contract will not change so long as he did not violate the terms of the

induced him to apply for a Capital One credit card but he testified that his interest rate was a fixed 9.5% which he considered to be low.[95]   Lavallie testified that he did not believe the 2005 Customer Agreement applied to him because he believed he had been "grandfather[ed]" into the terms of the advertisements.[96]   Lavallie believed he was a "for-life customer with a fixed rate."[97] He felt he had a "handshake agreement with them based on the TV ads."[98]   Lavallie testified that he did not see any difference between the terms "low fixed" and "fixed for life."[99]   To him a "fixed rate [] means that it's not going to change" and "there's no time definition in that.  For life for me means life."[100]   He further stated: "I can't tell you if the ad said fixed for life or if it just said fixed."[101]

Due to the age of Lavallie's account, the original customer agreement sent on

---

agreement.

[95]      *Id.*, ¶ 108.

[96]      *See* Lavallie Depo., at 139.

[97]      *Id.* at 8, 141.

[98]      *Id.* at 146.

[99]      *Id.* at 9.

[100]     *Id.*

[101]     *Id.*

his account is not available.[102]  Capital One did send the Plaintiff the 2005 Customer

Agreement shortly after its effective date.[103] Lavallie's account statements demonstrate

that the APR for purchases was fixed at 9.9% from August 12, 2000, to January 12,

2002 when it switched to a fixed rate of 8.9%.[104]  On August 12, 2003, it changed to

a fixed rate of 6.9%; on March 12, 2005, to a variable rate of 10.65%; on April 12,

2005, to a fixed rate of 7.9%; on March 14, 2007, to a fixed rate of 9.9%; on May 12,

2007, to a variable rate of 9.88%; on April 18, 2008 to a fixed rate of 9.9%; and on

June 18, 2008, to a variable rate of 10.11%.[105]

Lavallie's account was part of the 2009 Change in Terms.[106]  Jiulianti testified

that Lavallie was mailed notice of the Change in Terms to the Hampton, Georgia

---

[102]    *See* DSMUF, ¶ 112 & n.5.

[103]    *Id.*, ¶ 111.

[104]    *Id.*, ¶ 112.

[105]    *Id.* (citing Jiulianti Decl., ¶¶ 135-47). Lavallie attempts to dispute these facts by stating that the accounts speak for themselves and that Jiulianti's declaration is hearsay.  As the Court has explained above, on a motion for summary judgment, the Court may consider hearsay evidence that can be reduced to admissible evidence at trial.  The account statements are business records that can be introduced through Jiulianti.  Lavallie does not dispute the actual facts of the rate changes.  As such, the Court rejects Lavallie's attempt to deny this statement of fact.

[106]    *Id.*, ¶ 113.

address associated with Lavallie's account.[107]  Lavallie's account shows that Offer ID Notice No. 15468 was mailed to him on May 12, 2009.[108]  Exhibit A-20 is a reproduction of Notice No. 15468.[109]

Notice ID No. 15468 informed Lavallie that the rates for Purchase and Balance Transfers and Cash Advances would be changing.[110]  The new Purchase and Balance Transfers rate would be a variable rate at 17.9% and Cash Advance rate would also be variable and at 24.9%.[111]  The Notice went on to state that "[y]ou can choose to decline this change and close your account."[112]  "If you decline, we will close your account on August 2, 2009. . . . If you decline, you will be able to pay down your balance at your existing terms.  Please keep in mind that any transactions you make prior to August 2, 2009 will still post to your account."[113]  Lavallie did not decline the

---

[107]     *See* Jiulianti Decl., ¶¶ 148-53.

[108]     *See* Def.'s Exh. A-18, at 35.

[109]     *See* Jiulianti Decl., ¶ 149. Exhibit A-20 is formatted differently than what Lavallie would have received in the mail, although the content is the same.  *See* Jiulianti Decl., ¶ 149 & n.17.

[110]     *See* Def.'s Exh. A-20, at 1.

[111]     *Id.*

[112]     *Id.* at 4 (explaining how to decline and close account).

[113]     *Id.*

Change in Terms.[114]

Lavallie testified that he did not receive notice of the Change in Terms.[115]   He

first noticed the increase in his interest rates when he opened his statement in August

2009 and noticed that his interest charges and minimum payment had increased by

$100 because his interest rate went up from 7.9% to 17.9%.[116]

### 6.    Solsberry Facts

Solsberry received an offer from Capital One in 2004 for a 0% APR on balance

transfers through his January 2007 billing period and a variable APR of 10.9%

thereafter.[117]    Capital One's records do not reflect any other length of time that

Solsberry's APRs would remain in effect at the time he opened his account.[118]

Solsberry did not receive a fixed "for life" offer.[119]  Solsberry stated that at the time

---

[114]      *See* DSMUF, ¶ 118 & Resp.

[115]      *See* Lavallie Depo., at 52, 88, 92, 94, 105, 119, 130, 133, and 206.

[116]      *Id.* at 28-29.

[117]      *See* DSMUF, ¶ 119.

[118]      *Id.*, ¶ 120.

[119]      *Id.*, ¶ 121. As with many other Plaintiffs, Solsberry attempts to dispute this fact by stating "[w]hile the catch phrase 'for life' was never used, Mr. Solsberry's terms were such that, so long as he did not violate the terms of his credit card agreement, and Capital One did not cease to exist or otherwise go bankrupt, Capital One would continue to honor its end of the bargain by loaning him money at the previously agreed rate." *See* Resp., ¶ 121.  Again, the Court cannot discern the legal

he opened the account, he received "multiple, unsolicited emails from Capital One advertising low and/or fixed interest rates."[120]  Solsberry did not retain any of those emails.[121]

Solsberry opened his Capital One credit card on October 18, 2004 and closed the account on May 2010.[122]   There is nothing in the record which shows the agreement that governed Solsberry's card when he first opened it, but shortly after its effective date, Capital One mailed the 2005 Customer Agreement.[123] Solsberry testified that under the terms of the 2005 Customer Agreement, he understood that the account could be closed and that its terms could be changed.[124]

Jiulianti testified as to the contents of Solsberry's account statements.[125]

---

significance of this statement in terms of "honor its end of the bargain."  The Plaintiffs' response does not dispute the Defendant's statement of fact that Solsberry was not given a "fixed for life" offer on APR for this credit card.  The Plaintiffs' response does not point to any language in an agreement which reflected a "bargain" as described by the Plaintiffs.

[120]     *Id.*, ¶ 122.

[121]     *Id.*

[122]     *Id.*, ¶ 124.

[123]     *Id.*, ¶ 125 (citing Jiulianti Decl., ¶ 163).

[124]     *See* Solsberry Depo., at 62.

[125]     As the Court noted above, Solsberry's objections that the "statements speak for themselves" is not sufficient at the summary judgment stage to dispute the Defendant's statement of fact.

Solsberry's account had a variable rate from the opening of the account until February 22, 2007.[126] The rate varied from 11.23% to 14.95%.[127] In April 2007, the default APR on Solsberry's account changed to a variable rate of 28.15%.[128] In July 2008, the APR for purchases changed to a fixed rate of 7.9%.[129]

Solsberry testified that from March 2007 to September 2008, he had no balance on the card because he felt his interest rates were too high.[130] In August 2008, Solsberry said he received a telephone call from Capital One saying the company noticed his card had a zero balance. Solsberry responded that he thought the interest rates were too high.[131] Capital One said "if we took down the interest rate and gave you a fixed rate for life would you put business back with us. And I said if the rate was correct sure and if the payment was correct. He said how about 7.9 percent. I said sold, okay, I'll do a balance transfer."[132] Solsberry was sent a letter on August

---

[126]    *See* DSMUF, ¶ 126.

[127]    *Id.*

[128]    *Id.*

[129]    *Id.*

[130]    *See* Solsberry Depo., at 39.

[131]    *Id.* at 40.

[132]    *Id.*

12, 2008 memorializing this conversation.[133]   The letter states:

> Thank you for your recent inquiry into your Capital One account.  We are very pleased we have had the opportunity to show our commitment to you.

> As we discussed we are reducing the rate for purchases to a fixed rate of 7.9%.  Your rate for cash advances is a fixed rate of 7.900%% [sic].[134]

Thus, the offer made by Capital One as described in the August 12, 2008 letter was for a "fixed" interest rate and there was no use of the term "fixed for life."[135]

When Solsberry got the February 2009 Change in Terms notice, he called and said he wanted to close the account and pay off the balance at the existing terms even though he did not think Capital One should be able to change his fixed 7.9% rate.[136]

Solsberry's account was also part of the May 2009 Change in Terms.[137] Jiulianti testified that Solsberry's account statements show that Offer ID Notice No. 15473 was mailed on May 12, 2009.[138]   Exhibit A-23 shows the contents of Notice

---

[133]    *See* Def.'s Reply, Docket Entry [69], Exh. X-2.

[134]    *Id.*

[135]    *Id.*

[136]    *Id.* at 43-44.

[137]    *Id.*, ¶ 127.

[138]    *See* Jiulianti Decl., ¶ 169 (citing Def.'s Exh. A-21, at 35).

No. 15473.[139]  Notice No. 15473 was sent to the address on Solsberry's account in

Kennesaw, Georgia.[140]  Notice No. 15473 stated that Capital One was changing the

terms of the account Purchase and Balance Transfer Rate as of the billing cycle

beginning July 2, 2009.[141]  The new rate would be variable at 17.9%.[142]  The Notice

went on to state that "[y]ou can choose to decline this change and close your

account."[143] "If you decline, we will close your account on August 2, 2009. . . . If you

decline, you will be able to pay down your balance at your existing terms.  Please

keep in mind that any transactions you make prior to August 2, 2009 will still post to

your account."[144]  Solsberry did not decline the Change in Terms.[145]

Solsberry testified that he did not receive notice of the May 2009 Change in

Terms.[146]  Solsberry testified that he did receive notice of the February 2009 Change

---

[139]   *See* Def.'s Exh. A-23. Exhibit A-23 is formatted differently than what Solsberry would have received in the mail, although the content is the same.  *See* Jiulianti Decl., ¶ 169 & n.20.

[140]   *See* Jiulianti Decl., ¶¶ 169-73.

[141]   *See* Exh. A-23, at 1.

[142]   *Id.*

[143]   *Id.* at 4 (explaining how to decline and close account).

[144]   *Id.*

[145]   *See* DSMUF, ¶ 132 & Resp.

[146]   *See* Solsberry Depo., at 6.

in Terms and opted-out of those changes.[147]  Solsberry did close the account then and would make the remaining payments at 7.9% until the balance was cleared.[148]  He testified that shortly after he opted-out, Capital One called him to reactivate the card at the 7.9% fixed rate, which he did.[149]  However, Solsberry testified that his rate was increased from 7.9% to 17.9% beginning with the July 29, 2009 statement.[150]

Solsberry made no payments on his account after November 23, 2009.[151] Solsberry filed for bankruptcy in April 2010.[152]  On May 2010, Capital One "charged off" his account with a balance of $17,043.75.[153]

### 7.    Mancuso Facts

Although Capital One offered a solicitation it contends was the one sent to Mancuso, that solicitation has the name of "Thurston" on it and Mancuso did not recognize it at her deposition.[154]  However, at her deposition, Mancuso was asked to

---

[147]    *Id.* at 6.

[148]    *Id.*

[149]    *Id.*

[150]    *Id.* at 10.

[151]    *See* DSMUF, ¶ 133.

[152]    *Id.*, ¶ 134.

[153]    *Id.*

[154]    *See* Mancuso Depo., at 19.

look at account statements for her two Capital One credit cards.[155]  For the account ending -2324, her statements show that from January 16 to February 15, 2003, the account had a 0% APR on purchases.  Several months later, that APR went up to 14.9%.[156]  For the account ending -2336, the first statement was for May 2003.[157]  It also began with a 0% introductory APR and then rose to 14.9%.[158] Mancuso got a third credit card in 2005 ending in -5888.[159]  The rate on that card appears to be variable starting at 15.15% and fluctuating with 12.9% and 4.9%.[160]

Mancuso testified that she did not believe she ever had a fixed rate with Capital One.[161]  Mancuso believed that if she had good credit, she could request a lower rate from Capital One.[162]  But she also understood that the rate could go higher as well.[163]

Mancuso's account ending -2324 opened on February 1, 2003.  There is no

---

[155]     *Id.* at 19-27.

[156]     *Id.* at 22-23.

[157]     *Id.* at 24.

[158]     *Id.* at 24-25.

[159]     *Id.* at 25.

[160]     *Id.* at 26-27.

[161]     *Id.* at 31.

[162]     *Id.*

[163]     *Id.* at 32.

record of what Customer Agreement governed that account.[164]  In 2005, a new Customer Agreement was sent to Mancuso.[165]

Mancuso opened the account ending -2336 in 2003.[166]  Although there is no specific record of the solicitation offered to Mancuso, as described above, the rates on her statements show a 0% APR introductory rate and then in November 2003, the APR rose to 14.9%.[167]  The 2336 account was opened on May 14, 2003.[168]  In 2005, a new Customer Agreement was sent to Mancuso.[169]

Mancuso's account ending -5888 was opened on June 25, 2005 and there is no specific document in the record that can be identified as a solicitation offer with respect to this account.[170]  Although he did not point to any specific document in the record, Jiulianti testified that the account had a variable APR of 14.9%.[171] As Mancuso testified in her deposition, she agreed that the account statements for -5888 showed

---

[164]  *See* DSMUF, ¶¶ 138-39.

[165]  *See* Jiulianti Decl., ¶ 184.

[166]  *See* DSMUF, ¶ 140 & Resp.

[167]  *Id.*

[168]  *Id.*, ¶ 143.

[169]  *See* Jiulianti Decl., ¶¶ 189-90.

[170]  *See* DSMUF, ¶¶ 145, 148 & Resps.

[171]  *See* Jiulianti Decl., ¶ 191.

a variable rate that fluctuated from 15.15% to 12.9% and 4.9%.[172] Moreover, the July 2005 billing statement shows a Purchase APR of 15.15% and a Cash Advance APR of 20.24%.[173] Because she opened this account in 2005, a 2005 Customer Agreement would have been sent to Mancuso within days after she opened the account.[174]

According to her account statements, Mancuso's cards all had an initial promotional rate of 0% fixed APR purchases.[175] For account ending -2324, the APR for purchases switched to a 14.9% fixed rate as of August 16, 2003.[176] For account ending -2336, that switch occurred on November 4, 2003.[177] For accounts ending -2324 and -2336, the rates changed four more times before the 2009 Change in Terms: May 16, 2005, to fixed rate of 12.9% (-2324); August 16, 2005, to a variable rate of 13.28% (-2324); February 16, 2006, to a fixed rate of 9.9% (-2324); May 16, 2006, to a fixed rate of 4.99% (-2324); May 4, 2005, to a fixed rate of 12.9% (-2336);

---

[172]    *See* Mancuso Depo., at 26-27.

[173]    *See* Exh. A-31, at 8-9.

[174]    *See* Jiulianti Decl., ¶ 195.

[175]    *See* DSMUF, ¶ 152. As the Court noted above, Mancuso's objections that the "statements speak for themselves" is not sufficient at the summary judgment stage to dispute the Defendant's statement of fact.

[176]    *Id.*

[177]    *Id.*

August 4, 2005, to a variable rate of 13.28% (-2336); March 4, 2006, to a fixed rate of 9.9% (-2336); April 4, 2006, to a fixed rate of 4.99% (-2336).[178]

On account ending -5888, the APR for purchases was a variable rate of 14.9% from June 28 to July 27, 2005.[179] On July 28, 2005, the APR for purchases changed to a fixed rate of 12.9%; on February 28, 2006, to a fixed rate of 9.9%, and on March 28, 2006, to a fixed rate of 4.9%.[180]

Mancuso's accounts ending in -2324, -2336, and -5888 were part of the 2009 Change in Terms.[181] Jiulianti testified that Mancuso's -2324 account statements show that Offer ID Notice No. 14798 was mailed on February 2, 2009.[182] The same notice was mailed to account ending -2336 on February 2, 2009.[183] For account ending -5888, Offer ID Notice No. 14802 was mailed on February 2, 2009.[184]

---

[178]    *Id.* (citing Jiulianti Decl., ¶¶ 196-209).

[179]    *See* DSMUF, ¶ 153.

[180]    *Id.* (citing Jiulianti Decl., ¶¶ 210-13).

[181]    *See* DSMUF, ¶ 154.

[182]    *See* Jiulianti Decl., ¶ 214 (citing Def.'s Exh. A-24, at 40).

[183]    *See* Jiulianti Decl., ¶ 214 (citing Def.'s Exh. A-27, at 41).

[184]    *See* Jiulianti Decl., ¶ 214 (citing Def.'s Exh. A-30, at 40).

Exhibits A-26 and A-29 show the contents of Notice No. 14798.[185] Notice No. 14798 was sent to the address on Mancuso's account in Galloway, New Jersey.[186] Notice No. 14798 stated that Capital One was changing the terms of the account Purchase and Balance Transfer Rate, the Cash Advance Rate and the Default Rate.[187] The Cash Advance and Default APR would change beginning with the April 17, 2009 billing period.[188] The Purchase and Balance APR rate would not change until January 2010 when the introductory billing rate would expire.[189] The Cash Advance rate would be a variable rate equal to 24.9%.[190] The Default Rate would be a variable rate equal to 29.4%.[191] The Purchase and Balance APR rate would change to a variable rate equal to 13.9%.[192] The Notice went on to state that "[y]ou can choose to decline

---

[185]    *See* Def.'s Exhs. A-26 & 29. Exhibits A-26, A-29, and A-32 are formatted differently than what Mancuso would have received in the mail, although the content is the same. *See* Jiulianti Decl., ¶ 215 & n.22.

[186]    *See* Jiulianti Decl., ¶¶ 215-19.

[187]    *See* Exh. A-26 and A-29, at 1.

[188]    *Id.* at 3.

[189]    *Id.* at 2.

[190]    *Id.* at 3.

[191]    *Id.*

[192]    *Id.* at 2.

this change and close your account."[193] "If you decline, we will close your account on May 17, 2009. . . . If you decline, you will be able to pay down your balance at your existing terms. Please keep in mind that any transactions you make prior to May 17, 2009 will still post to your account."[194] Mancuso did not decline the Change in Terms.[195]

Exhibit A-32 shows the contents of Offer ID Notice No. 14802.[196] Notice No. 14802 was sent to the address on Mancuso's account in Galloway, New Jersey.[197] Notice No. 14802 stated that Capital One was changing the terms of the account Purchase and Balance Transfer Rate and the Default Rate.[198] The new rate would be variable at 17.9%.[199] The Default APR would change beginning with the April 17, 2009 billing period.[200] The Purchase and Balance APR rate would not change until

---

[193]    *Id.* at 4 (explaining how to decline and close account).

[194]    *Id.*

[195]    *See* DSMUF, ¶ 159 & Resp.

[196]    *See* Def.'s Exh. A-32.

[197]    *See* Jiulianti Decl., ¶¶ 215-19.

[198]    *See* Exh. A-32, at 1.

[199]    *Id.*

[200]    *Id.* at 3.

January 2010 when the introductory billing rate would expire.[201] The Default Rate

would be a variable rate equal to 29.4%.[202] The Purchase and Balance APR rate

would change to a variable rate equal to 13.9%.[203] The Notice went on to state that

"[y]ou can choose to decline this change and close your account."[204] "If you decline,

we will close your account on May 17, 2009. . . . If you decline, you will be able to

pay down your balance at your existing terms. Please keep in mind that any

transactions you make prior to May 17, 2009 will still post to your account."[205]

Mancuso did not decline the Change in Terms.[206]

Mancuso testified that she never received the 2009 Change in Terms.[207] She

stated she learned of the increases when she looked at her statement after the Change

in Terms.[208]

### 8. Roberti Facts

---

[201] *Id.* at 2.

[202] *Id.*

[203] *Id.* at 2.

[204] *Id.* at 4 (explaining how to decline and close account).

[205] *Id.*

[206] *See* DSMUF, ¶ 159 & Resp.

[207] Mancuso Depo., at 36.

[208] *Id.*

In 2007, Capital One offered Roberti a variable APR on purchases of prime plus 5.15% or a variable rate of 12.9%.[209]  Roberti understood that her variable rate of prime plus 5.15% would be "indefinite."[210]   There is no evidence in the record that Capital One made Roberti a "fixed for life" offer.[211]   Roberti responded to an interrogatory and stated that she could not specifically identify any individual commercial or advertisement that caused her to open a Capital One account but does generally recall the "no hassle" and "what's in your wallet?" commercials.[212]

At the time Roberti opened the account in 2008, she received a folded Customer Agreement with the card.[213] Roberti agreed that part of that Customer Agreement stated that Capital One could change any part of the agreement, including the annual percentage rate.[214]  The Customer Agreement in effect at that time was the 2005 Customer Agreement.[215]

From January 24, 2008 to December 20, 2008, the variable APR for Purchases

---

[209]     *See* DSMUF, ¶ 160.

[210]     *See* Roberti Depo., at 5.

[211]     *See* DSMUF, ¶ 162 & Resp.

[212]     *Id.*, ¶ 163.

[213]     *See* Roberti Depo., at 64 (and Roberti Depo. Exh. 4).

[214]     *Id.* at 66.

[215]     *See* Jiulianti Decl., ¶ 228.

fluctuated from 10.15% to 12.4%.[216] From December 21, 2008 onward, the variable APR for Purchases remained at 8.4%.[217]

Roberti's account was part of Capital One's 2009 Change in Terms.[218] According to Roberti's account statements, she was mailed Offer ID No. 14818 on February 2, 2009.[219] Offer ID No. 14818 is reproduced as the Defendant's Exhibit A-35.[220] Notice No. 14818 was sent to the address on Roberti's account in Montgomery, Alabama.[221] Notice No. 14818 stated that Capital One was changing the terms of the account Purchase and Balance Transfer Rate and the Default Rate.[222] The new Purchase rate would be variable at 17.9%.[223] The Purchase and Balance APR rate would not change until January 2010 when the introductory billing rate would

---

[216]    *See* DSMUF & Resp., ¶ 167.

[217]    *Id.* As the Court noted above, Roberti's objections that the "statements speak for themselves" is not sufficient at the summary judgment stage to dispute the Defendant's statement of fact.

[218]    *Id.*, ¶ 168.

[219]    *See* Jiulianti Decl., ¶ 231 (citing Def.'s Exh. A-33, at 38).

[220]    Exhibits A-35 is formatted differently than what Roberti would have received in the mail, although the content is the same. *See* Jiulianti Decl., ¶ 231 & n.26.

[221]    *See* Jiulianti Decl., ¶¶ 232-35.

[222]    *See* Exh. A-35, at 1.

[223]    *Id.*

expire.[224] The Default APR would change beginning with the April 17, 2009 billing period.[225]  The Default Rate would be a variable rate equal to 29.4%.[226]  The Notice went on to state that "[y]ou can choose to decline this change and close your account."[227]  "If you decline, we will close your account on May 17, 2009. . . . If you decline, you will be able to pay down your balance at your existing terms.  Please keep in mind that any transactions you make prior to May 17, 2009 will still post to your account."[228]  Roberti did not decline the Change in Terms.[229]

Roberti testified that she did not receive notice of the rate changes.[230]  Because she was a "paperless" customer, Roberti also testified that she did not see any messages concerning the expiration of "promotional" rates on her statement, called "in-statement" notices.[231]  Although Roberti could have downloaded the full paper

---

[224]    *Id.* at 2 (noting that "your existing Purchase rate will be treated as a promotional Purchase rate that won't expire until 2010").

[225]    *Id.* at 3.

[226]    *Id.*

[227]    *Id.* at 4 (explaining how to decline and close account).

[228]    *Id.*

[229]    *See* DSMUF, ¶ 174 & Resp.

[230]    *See* Roberti Depo., at 4, 70.

[231]    *Id.* at 27-30.

statement on-line, she never felt the need to do so.[232]   Roberti did not learn of the

increased interest rates until her January 2010 billing statement when she noticed the

increased finance charge on her online summary.[233]

## 9.   Kolkowski Facts

In 2005, Kolkowski received a mail solicitation offering "0% Fixed APR on

balance transfers AND purchases until December 2006" and a variable APR of 7.99%

on balance transfers and purchases thereafter.[234] Kolkowski identified the solicitation

during her deposition.[235] There is no evidence in the record that Kolkowski received

any "fixed for life" offer.[236]

The solicitation to which Kolkowski responded contained the following

language under "OFFER CONDITIONS":

> Arbitration: I understand that the Customer Agreement contains an
> Arbitration Provision that may limit my legal rights, including my right
> to go to court, to have a jury trial, and to participate in class actions.  I
> will receive the Capital One Customer Agreement and am bound by its
> terms and all future revisions.  My agreement terms (for example, rates

---

[232]   *Id.* at 31-36.

[233]   *Id.* at 50.

[234]   *See* DSMUF, ¶ 175.

[235]   *Id.*; Def.'s Exh. A-37.

[236]   *Id.*, ¶ 177 & Resp.

and fees) are subject to change.[237]

Shortly after Kolkowski opened her account, Capital One would have mailed a 2005 Customer Agreement.[238]

According to the statements from Kolkowski's account, the promotional 0% fixed APR for Purchases ran until December 20, 2006, when the APR for purchases switched to a variable rate of 9.45%.[239] On January 26, 2008, the APR for Purchases changed to a variable rate of 8.64%.[240]

Kolkowski's account was part of Capital One's 2009 Change in Terms.[241] According to Kolkowski's account statements, she was mailed Offer ID No. 14805 on February 2, 2009.[242] Offer ID No. 14805 is reproduced as the Defendant's Exhibit A-41.[243] Notice No. 14805 was sent to the address on Kolkowski's account in Arroyo

---

[237]   *See* A-37, at 8.

[238]   *See* DSMUF, ¶ 181 & Resp. (citing Jiulianti Decl., ¶ 245).

[239]   *See* DSMUF, ¶ 182. As the Court noted above, Kolkowski's objections that the "statements speak for themselves" is not sufficient at the summary judgment stage to dispute the Defendant's statement of fact.

[240]   *Id.*

[241]   *See* DSMUF, ¶ 183.

[242]   *See* Jiulianti Decl., ¶ 253 (citing Def.'s Exh. A-39, at 44).

[243]   Exhibits A-41 is formatted differently than what Kolkowski would have received in the mail, although the content is the same. *See* Jiulianti Decl., ¶ 253 & n.31.

Grande, California.[244] Notice No. 14805 stated that Capital One was changing the terms of the account Purchase and Balance Transfer Rate, Cash Advance Rate, and Default Rate.[245] The new rates would take effect for all billing periods after April 17, 2009.[246] The new Purchase rate would be variable at 15.9%.[247] The Cash Advance Rate would be variable at 24.9%.[248] The Default Rate would be a variable rate equal to 29.4%.[249] The Notice went on to state that "[y]ou can choose to decline this change and close your account."[250] "If you decline, we will close your account on May 17, 2009. . . . If you decline, you will be able to pay down your balance at your existing terms. Please keep in mind that any transactions you make prior to May 17, 2009 will still post to your account."[251] Kolkowski did not decline the Change in Terms.[252]

---

[244] *See* Jiulianti Decl., ¶¶ 254-57.

[245] *See* Exh. A-41, at 1.

[246] *Id.*

[247] *Id.*

[248] *Id.*

[249] *Id.*

[250] *Id.* at 4 (explaining how to decline and close account).

[251] *Id.*

[252] *See* DSMUF, ¶ 188 & Resp.

Kolkowski testified that she did not receive notice of the Change in Terms.[253]

Kolkowski did not make payments on the account after September 19, 2009.[254] Capital One closed her account on December 9, 2009.[255]    Kolkowski filed for bankruptcy in December 2010.[256]

## C.    Contentions

The Defendant argues because the Plaintiffs had the option to decline the proposed APR changes and because the 2005 Customer Agreement expressly authorized such changes, the Plaintiffs' claims for breach of contract and implied covenant, breach of implied contract, unconscionability of contract, unjust enrichment, declaratory judgment, California Consumer Legal Remedies Act, California Unfair Competition Law, California False Advertising Law, Kansas Consumer Protection Act, and New Jersey Consumer Fraud Act fail. The Defendant further contends that because the Truth in Lending Act only requires that the issuer mail the notice and not that it actually be received, the Plaintiffs' notice claims under that federal statute also fail. The Defendant contends that the Plaintiffs' Truth in Lending claim regarding

---

[253]    *See* Kolkowski Depo., at 68, 78, and 87.

[254]    *See* DSMUF, ¶ 189.

[255]    *Id.*

[256]    *Id.*, ¶ 190.

misleading solicitations is without merit because no reasonable consumer would believe that any Capital One solicitation promised a fixed or low rate for as long as the consumer wanted to borrow. The Defendant further argues that the Truth in Lending Act claim is barred by the one year limitations period because the Plaintiffs filed their complaint more than one year after having received their solicitations.

Finally, the Defendant argues that the Court should also grant the Defendant's motion for summary judgment on the Plaintiffs' state law claims because (1) the Plaintiffs cannot bring an implied covenant claim where express terms of an agreement grant Capital One authority to take certain action and the Plaintiffs cannot show damages because they had the option to decline the new terms, (2) the Plaintiffs' implied contract and unjust enrichment claims are barred because of the written agreement that governed the relationship between Capital One and the Plaintiffs, (3) a rate increase authorized by applicable law is not unconscionable, and (4) the Plaintiffs' state statutory claims are time-barred and the Plaintiffs have not identified any deceptive or unfair acts.

The Plaintiffs respond that their breach of contract claim survives because the Defendant had solicited the Plaintiffs with promises of "low" or "fixed" rates such that the Plaintiffs assumed their rates would not increase. The Plaintiffs also argue that the Defendant violated the covenant of good faith and fair dealing because the increase

in interest rates was so far above the market rates. With respect to this claim, the Plaintiffs also argue that they could not have simply cancelled their credit cards and paid off their existing balances because they never received proper notice of the 2009 Change in Terms. Finally, the Plaintiffs contend that the Defendant did not comply with either the procedural or substantive requirements of the Truth in Lending Act in mailing notice of the 2009 Change in Terms to its customers. The Plaintiffs contend that the R.R. Donnelly mailing process was not sufficient to assure that each Capital One customer received notification of the Change in Terms. Additionally, the envelope for the Change in Terms notice was indistinguishable from the other "junk mail" sent by the Defendant. Further, in looking at the language of the notices mailed, the Plaintiffs argue that it was not clear to customers that if they did not decline the new terms, their existing balances would also be subject to the higher interest rates. The Plaintiffs also respond that the Defendant's use of the term "fixed" was confusing because consumers understood this term to mean "fixed for life" and not "fixed" as opposed to "variable."

## II. Discussion

### A.    Preliminary Matters

The parties' statements of material facts are wide-ranging and unfocused. The Court has undertaken to limits its discussion of facts to those that are relevant to the

causes of action raised by the Plaintiffs. There is no doubt that discovery has demonstrated that the Defendant sent hundreds of millions of direct mail solicitations during the relevant time period. Discovery also shows that it was an enormous task for the Defendant to track card holders with the terms of their initial offer. When the Defendant made the decision to change the terms of the credit cards, it was again difficult for the Defendant to track groups of card holders and tailor communications of the changes to those card holders. Similarly, discovery reveals that the Defendant made the decision to change the terms of the credit card agreements in 2009 to minimize its risk in a difficult economic environment in which credit status fluctuated wildly. None of these facts on its own, however, supports a violation of any of the causes of action raised by the Plaintiffs. Particularly, standing alone, the desire of the company to reduce the cost of doing business in an uncertain economic environment is not wrongful.

The Plaintiffs also attempt to draw attention to their belief that the Defendant rushed to implement these changes in early 2009, ahead of the August 22, 2009, effective date of the Credit Card Accountability Responsibility and Disclosure Act of 2009 ("Credit CARD Act"), amending 15 U.S.C. § 1637, which would alter regulatory requirements on credit card companies and put certain restrictions on "repricing." The Plaintiffs' unfortunate focus on these issues has distracted the parties from providing

factual support for their positions with respect to the causes of action alleged in the Amended Complaint.

The Court has previously addressed this problem when it stated:

> The common questions identified in the Amended Complaint relate to (1) Capital One's representations about its products; (2) whether Capital One unilaterally increased annual percentage rates; (3) whether the card agreement and applicable law allowed that increase; (4) whether Capital One misrepresented its product; (5) and whether a reasonable consumer would likely have been deceived by Capital One's representations. Amended Compl., ¶ 76. The court cannot perceive of any manner in which any of the issues in this case would be informed by documents relating to Capital One's knowledge of impending regulatory changes. The issues in this case center around Capital One's actions and whether they complied with applicable law and the parties' contractual obligations. Whether Capital One was hastily implementing the allegedly unlawful scheme to raise interest rates because of impending regulatory changes is not germane to Plaintiffs' causes of action.[257]

Despite this previous guidance from the Court, the Plaintiffs have not been able to center their arguments on their legal causes of action.

Further, the Plaintiffs' response to the Defendant's motion is peppered with generalities about how the Change in Terms process worked and references to solicitations and groups of Capital One card holders and decisions made about them. The focus at this point in the litigation, however, is whether the individually-named Plaintiffs can raise these causes of action against the Defendant. If they cannot, the

---

[257] *See* Order, Docket Entry [93], at 12.

Court does not even get to any class-wide issues which might broaden the litigation beyond what happened to these individual Plaintiffs. Unless arguments are tied to the specific Plaintiffs before the Court, the Court does not address them.

It appears to the Court that the Plaintiffs allege three main problems with the Defendant's actions: Capital One (1) did not keep specific promises concerning interest rates; (2) imposed very large increases on customers which were outside of the market range and therefore violative of good faith and fair dealing; and (3) did not give proper notice of the 2009 Change in Terms. The Plaintiffs have raised the following causes of action based on these complaints: (I) breach of contract and implied covenant; (II) Truth in Lending Act, failure to provide proper notice; (III) breach of implied contract; (IV) unconscionability of contract; (V) unjust enrichment; (VI) Truth in Lending Act, failure to provide proper notice; (VII) Truth in Lending, misleading solicitations; (VIII) declaratory judgment; (IX) California Consumer Legal Remedies Act; (X) California Unfair Competition Law; (XI) California False Advertising Law; (XII) Kansas Consumer Protection Act; and (XIII) New Jersey Consumer Fraud Act.

### B.     Breach of Contract

As the Court alluded to in the Statement of Facts, there is some question as to what version of the Customer Agreement various Plaintiffs received at the initial

opening of their credit cards. But there is no dispute that the 2005 Customer Agreement was in place at the time of the 2009 Change in Terms.[258] Furthermore, during the time of the Change in Terms, the back of each of the Plaintiffs' Capital One credit card read: "By accepting, signing or using this card, you agree to Capital One's present and future rules and regulations."[259]

The 2005 Customer Agreement also contains an "Account Closure and Suspension of Credit Privileges" clause, which provides:

> **Account Closure and Suspension of Credit Privileges**. (1) We may, at any time, with or without cause, with or without advance notice, and regardless or the existence or non-existence of a default under this Agreement, cancel the account . . .[260]

The 2005 Customer Agreement contains a "Changes in Terms" clause, which provides:

> **Changes In Terms.** We may add to, remove, amend or change any part or provision of this Agreement, including the annual percentage rate(s) and any charges, (including adding new provisions of the same or a different nature as the existing provisions in this Agreement) at any time. If we do so, we will give you notice of such amendment or change if

---

[258] *See* DSMUF, ¶ 5. The Plaintiffs attempted to dispute this fact by arguing that some the Plaintiffs did not notice the changes in their APRs until 2010 and therefore, the 2010 Customer Agreement might be in play. The Court disagrees. There is no dispute that the Defendant imposed the Change in Terms in 2009 when the 2005 Customer Agreement was in effect.

[259] *Id.*, ¶ 4.

[260] *See* Jiulianti Decl., ¶ 21.

required by Federal law or Virginia law (to the extent not preempted by Federal law) unless we had previously notified the customer that the account would be subject to such amendment or change without notice. Notice will be mailed to the last billing address indicated in our records for the account. However, no notice will be mailed if we previously had notified you that your account would be subject to such amendment or change without notice. Changes to the annual percentage rate(s) will apply to your existing account balance from the effective date of the change, whether or not the account balance includes transactions billed to the account before the change date and whether or not you continue to use the account. Changes to fees and other charges will apply to your account from the effective date of the change.[261]

But its terms, the 2005 Customer Agreement is governed by federal and Virginia law. The elements of a breach of contract claim under Virginia law are: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) defendant's violation of that obligation; and (3) resulting harm to the plaintiff.[262]

The precise source of the Plaintiffs' breach of contract claim is not clear to the Court. The Plaintiffs point to no particular provision of the 2005 Customer Agreement they believe the Defendant breached. This is probably because the clear language of the 2005 Customer Agreement authorized Capital One to change the interest rates charged on the card. Moreover, as the Defendant points out, the terms of the 2005 Customer Agreement allowed Capital One to cancel the account without any cause or

---

[261]   *Id.*, ¶ 22.

[262]   *See*, *e.g.*, *Filak v. George*, 267 Va. 612, 619 (2004).

advance notice regardless of whether there was a default. The Defendant contends it exercised its rights under this clause by offering to the Plaintiffs to close the account if the Plaintiffs did not like the new interest rates and this offer allowed the Plaintiffs to pay off the existing balance at the existing terms. If the Plaintiffs agreed to the increased interest rates, the Defendant would offer the Plaintiffs credit at the new terms. The Court notes that these particular terms of the 2005 Customer Agreement are in compliance with Virginia law which authorizes unilateral rate increases so long as there is notice.[263] Thus, the Court finds the Plaintiffs have not stated a breach of contract claim with respect to the language of the 2005 Customer Agreement.

The gravamen of the Plaintiffs' complaint appears to be that Capital One made promises of "low" or "fixed" rates in commercials or other solicitations and therefore any alteration of interest rates is a breach of those initial solicitations.[264] The Plaintiffs did generally testify that they were attracted by Capital One's marketing campaign which promised "low" interest rates and "no hassles" cards. The major flaw in this theory, however, is that the Plaintiffs (other than Kolkowski) have not identified any

---

[263]    *See* Va. Code Ann. § 6.2-433(A) & (B) (permitting banks to increase rates on existing and future balances after notice to customer).

[264]    *See* Resp., Docket Entry [53], at 19-20. In their reply brief, the Plaintiffs modify this argument by stating that somehow, the "low" and "fixed" promises became part of the Customer Agreement. The Court finds no legal basis for this argument.

specific solicitation to which they responded when seeking their Capital One credit cards.[265]  As a result, there is no way for the Court or a reasonable jury to determine whether any actions taken by Capital One in 2009 violated any term of the initial solicitations.

Significantly, even if the Plaintiffs could show the "low" and "fixed" solicitation to which they responses, their breach of contract claim would still fail. *Rubio v. Capital One Bank*,[266] relied on by the Plaintiffs, for their Truth in Lending Act claims, is of no help to them for their breach of contract claims because *Rubio* holds that the initial solicitation by a credit card company cannot form the basis of a breach of contract claim.  In *Rubio*, the plaintiff argued that because her solicitation offered a credit card at a "fixed" APR of 6.99% and that rate was later increased to 15.9%, Capital One breached its contract.  The Court rejected this argument finding that the solicitation was not an "offer" under any theory of contract law because the

---

[265]    The Plaintiff Kolkowski is the only Plaintiff who was able to point to the specific solicitation that caused her to fill out a credit card application with Capital One.  There is no dispute that Kolkowski's solicitation offered a "0% fixed rate APR on purchases and balance transfers until December 2006" and a variable rate thereafter.  The terms of that solicitation are clear that the 0% rate was for a promotional period only and thereafter, the rate would be variable.  Thus, the Court finds that no reasonable jury could conclude that Kolkowski was offered a "fixed for life" rate of 0%.

[266]    613 F.3d 1195 (9th Cir. 2010).

solicitation could not simply be "accepted" by the consumer.  Rather, the consumer had to fill out a credit application form and there were a number of contingencies under which the application could be rejected.[267]  Thus, the Court found that the "solicitation and application do not constitute an enforceable contract."[268]

For the foregoing reasons, the Court GRANTS the Defendant's motion for summary judgment as to the Plaintiffs' breach of contract claim.[269]

## C.    Good Faith and Fair Dealing (Virginia)

The Plaintiffs also contend that the Defendant breached the covenant of good faith and fair dealing implied in every contract under Virginia law.  In Virginia, "when parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights.  This is so under either the common law or the Uniform Commercial Code. . . ."[270]  As the Court found above, the

---

[267]    *Id.* at 1205.

[268]    *Id.* Although *Rubio* applied California law, the basic offer and acceptance concepts used to analyze the plaintiff's claims there are similar across the common law of contracts.

[269]    For the same reason, the Plaintiffs' argument that Capital One had an "internal policy" that it would not change a "fixed" rate for three years cannot form the basis of any breach of contract claim.  Any such "policy" was not an agreement between consumers and Capital One.

[270]    *Ward's Equipment, Inc. v. New Holland North America, Inc.*, 254 Va. 379, 385 (1997) (comparing Michigan and Virginia law).  *See also Charles E. Brauer Co. v. NationsBank of Virginia, N.A.*, 251 Va. 28, 33 (1996) (party cannot breach

Defendant did not breach the 2005 Customer Agreement with the Plaintiffs and the Plaintiffs offered no other contract which could have been breached.

This would appear to end the inquiry of good faith and fair dealing; however, a line of cases has developed out of *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*,[271] which holds that in Virginia, every contract contains an implied covenant of good faith and fair dealing which requires a party to exercise its discretion under a contract in good faith. *See also Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009).[272] Citing *Contractual Good Faith*, a hornbook, *Virginia Vermiculite* held that "although the duty of good faith does not prevent a party from exercising its explicit contractual rights, a party may not exercise contractual discretion in bad faith, even when such discretion is vested solely in that party."[273] The Court then distinguished *Ward's Equipment* and *Charles E. Brauer*, by stating that they were not

---

implied covenant of good faith if it "did nothing more than exercise its rights provided in the loan documents and under the applicable law").

[271]     156 F.3d 535 (4th Cir. 1998) (applying Virginia contract law).

[272]     *SunTrust Mortgage, Inc. v. United Guaranty Residential Ins. Co.*, 806 F. Supp. 2d 872, 891-95 (E.D. Va. 2011), *rev'd*, 508 Fed. Appx. 243, 252-54 (4th Cir. 2013), contains a detailed discussion of the development of the law of good faith and fair dealing in Virginia.

[273]     156 F.3d at 542.

"inconsistent" with this rule.[274]  *Virginia Vermiculite* has been cited by countless

federal courts, but only three unpublished Virginia decisions.[275]

The Defendant argues that because the Plaintiffs were given the choice of either

closing their accounts and paying off their balance at the existing rate, or accepting

the higher rates, the Change in Terms could not violate good faith and fair dealing.

The Plaintiffs state that either choice would harm consumers and therefore violates the

covenant.

The Court need not dig to the philosophical bottom of Virginia law on the

covenant of good faith and fair dealing because even *Virginia Vermiculite* holds that

the covenant cannot bar a party for "exercising its explicit contractual rights."  If a

party has an explicit contractual right, the decision to exercise the right cannot be

deemed "discretionary" as that term is used in good faith and fair dealing discussions.

If a party could only exercise an explicit contractual right in good faith, then every

contractual right could be read as "discretionary."[276]  As the Court outlined above, the

---

[274]     *Id.*

[275]     *See*, *e.g.*, *Wachovia Bank, N.A. v. Ranson Tyler Chevrolet, L.L.C.*, 73 Va. Cir. 143 (2007) (while implied covenant of good faith and fair dealing "cannot contradict unambiguous rights, a 'party may not exercise contractual discretion in bad faith'")).

[276]     *See*, *e.g.*, *Skillstorm, Inc. v. Electronic Data Sys.*, 666 F. Supp. 2d 610 (E.D. Va. 2009) (refusing to apply good faith and fair dealing to defendant's express

only contract possibly at issue, the 2005 Customer Agreement, explicitly authorizes the Defendant to change any portion of the Agreement, including annual percentage rates, at any time. The Court finds the discretion granted under the Agreement is absolute and uncontrolled and therefore even under *Virginia Vermiculite*, the Plaintiffs have not stated a claim for breach of the implied covenant of good faith and fair dealing.[277]

### D.      Truth in Lending Act – Notice[278]

The Plaintiffs allege that they did not receive notice of the increase in rates at least 45 days in advance as required by Regulation Z of the Truth in Lending Act.[279] The purpose of the Truth in Lending Act is to "assure a meaningful disclosure of

---

right to terminate purchase orders even though contract stated defendant "may" terminate order for any reason).

[277]      In any event, even if the Court were to consider the Plaintiffs' substantive claim that the Defendant unfairly raised interest rates on the Plaintiffs' credit cards, the Court would find that claim without merit for the reasons discussed below in the Plaintiffs' Truth in Lending Act claims.

[278]      Because the Court ultimately concludes that the Plaintiffs have not stated a claim for a violation of the Truth in Lending Act, the Court need not address the Defendant's argument that the Plaintiffs' claims were not made within the one year statute of limitations period under the Act. *See* 15 U.S.C. § 1640(e).

[279]      The "notice" claims are brought only by the Plaintiffs Kautz, Lavallie, Mancuso, Roberti, and Kolkowski. The remaining the Plaintiffs do not deny they received notice of the Change in Terms, although they contest the substantive clarity of the notice.

credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices."[280] The Truth in Lending Act, itself, did not specify the manner in which such notice was to be given, but the Federal Reserve Board implemented what is known as "Regulation Z" to address specific issues of notice.[281]

At the time Capital One mailed its notices, Regulation Z required 15 days advance notice.[282] Regulation Z provided:

> Written notice required. Whenever any term required to be disclosed under § 226.6 is changed or the required minimum periodic payment is increased, the creditor shall mail or deliver written notice of the change to each consumer who may be affected. The notice shall be mailed to delivered at least 15 days prior to the effective date of the change.[283]

Under Regulation Z, the "creditor is only required to establish that it sent the notice,

---

[280]    15 U.S.C. § 1601(a); *see also Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195 (2011).

[281]    *See generally Household Credit Servs. v. Pfennig*, 541 U.S. 232, 238 (2004) (Congress has delegated to Federal Reserve Board authority to prescribe regulations effectuating Truth in Lending Act).

[282]    *See* 12 C.F.R. § 226.9(c)(1) (2009). (Regulation Z now requires a 45 day advance under the Credit Card Accountability Responsibility and Disclosure ("Credit CARD") Act of 2009.)

[283]    12 C.F.R. § 226.9(c)(1).

and need not prove that the consumer actually received the notice."[284] The 2005 Customer Agreement also required notice "if required by Federal law." The Agreement stated that notice would be mailed.

As the Court recounted above, Capital One contracted with R.R. Donnelly to process the mailings of the Change in Terms notices to Capital One customers. Gaylor testified as to the details of that process including accounting for the total number of names Capital One provided to R.R. Donnelly compared with the total number of mailings R.R. Donnelly provided to the United States Postal Service. Furthermore, for the five Plaintiffs who allege lack of notice, as the Court set forth above, Julianti testified that there is a record in each of their accounts as to the Change in Terms "Offer ID" number that was mailed as well as the fact that the notice was mailed to the address each Plaintiff had on file with Capital One at the time of the 2009 Change in Terms. The Court finds Gaylor's testimony and Capital One's account records are sufficient to meet the requirements of Regulation Z that notice be sent by the credit card company.

Although the Plaintiffs argue that Capital One did not reconcile individual names to mail pieces, had never undertaken such a massive mail notice effort before,

---

[284]  *See* 1 National Consumer Law Center, *Truth in Lending*, § 6.8.4.9 (7th ed. 2010).

and acknowledged there were errors in the mailing, none of these arguments is sufficient for the Court to find that Capital One did not "mail" the notices in accordance with Regulation Z. The Plaintiffs have cited to no requirement in the law that a perfect or near perfect job be done on the mailings. Gaylor's testimony is more than sufficient to show that a process was in place and tens of millions of notices were mailed out. Given the high number of mailings, a certain number of returns would be presumed.[285]

The Plaintiffs also contend that the 2009 Change in Terms notices were indistinguishable from other "junk mail" offers from Capital One. The Plaintiffs suggest it might have been more helpful if Capital One put "Your Interest Rate Is Going Up Unless You Act Now" message on the envelope.[286] To the extent some mailings were returned as undeliverable or the Plaintiffs can imagine a more eye-catching envelope style, Regulation Z does not require that the most perfect form of notice be provided. Rather, it states that Capital One must send written notice to

---

[285] In fact, the Plaintiffs' reference to errors in the mailing mainly address the Plaintiffs' allegations that certain accounts were erroneously placed in the Change in Terms project in the first place. That is not an argument that goes to whether the mailing procedure for the notice was sufficient.

[286] *See* Resp., Docket Entry [53], at 27.

customers.  The Court finds it has done so.[287]

### E.    Truth in Lending Act – Substance

As the Court described above, the Truth in Lending Act and its implementing

Regulation Z govern certain disclosures with respect to credit card annual percentage

rates ("APRs").[288]  Regulation Z designates certain disclosures that must be made to

consumers on credit card solicitations.  Issuers must disclose in a tabular form (what

is known as a "Schumer Box") the "annual percentage rate applicable to extensions

of credit under such credit plan" and fees.[289]  Other requirements on the disclosure of

interest rates are listed in the staff commentary to Regulation Z and require that: (1)

if the rate is temporary, the solicitation must disclose the rate that will apply after the

temporary rate expires, 12 C.F.R. pt. 226, Supp. I, § 226.5a(b)(1)(5) and (2) any

---

[287]    Finally, the Plaintiffs respond that under Virginia law, "denial of receipt creates a question of fact to be determined by the jury."  *See* Resp., Docket Entry [53], at 27.  But whether notice is sufficient under Regulation Z of the Truth in Lending Act is not a question of Virginia law.  *See*, *e.g.*, *Evans v. Chase Bank USA, N.A.*, 267 Fed. App'x. 692 (9th Cir. 2008) (unpublished opinion) (holding that any provision of Delaware or California law that might "independently require disclosure or notice," was preempted by federal law).

[288]    *See* 15 U.S.C. § 1637(c)(1)(A)(i)(I) and 12 C.F.R § 226.5a(b)(1). The Act recognizes two types of consumer credit transactions: open-end credit and closed-end credit.  *See generally Benion v. Bank One, Dayton N.A.*, 144 F.3d 1056, 1057 (7th Cir. 1998).  The credit cards at issue in this litigation are open-end credit.

[289]    15 U.S.C. §§ 1637(c)(1) (2009), 1632(c) (2009); 12 C.F.R. § 226.5a(a)(2)(i) (2011).

specific events that trigger a rate increase without any further notice, such as default rate increase, must be disclosed, 12 C.F.R. pt. 226, Supp. I, § 226.5a(b)(1)(7).

The Truth in Lending Act also specifies that the information "shall be disclosed clearly and conspicuously, in accordance with regulations of the [Board]."[290] The disclosure must be "in a reasonably understandable form and readily noticeable to the consumer."[291]

However, the Truth in Lending Act is a "disclosure statute" and "does not substantively regulate consumer credit but rather 'requires disclosure or certain terms and conditions of credit before consummation of a consumer credit transaction.'"[292]

The Eleventh Circuit addressed disclosure requirements under the Truth in Lending Act in *Veale v. Citibank F.S.B.*[293] There, mortgage borrowers filed suit against Citibank alleging that the bank had violated the Act because it did not provide

---

[290]    15 U.S.C. § 1632(a) (2009) and 12 C.F.R. § 226.5(a)(1) (2011).

[291]    12 C.F.R. pt. 226 supp. I, ¶ 5a(a)(2) cmt. 1.

[292]    *Rendler v. Corus Bank*, 272 F.3d 992, 996 (7th Cir. 2001) (quotation and citation omitted); *Szumny v. American Gen. Fin.*, 246 F.3d 1065, 1070 (7th Cir. 2001) ("A creditor's substantive rights are still governed by state law; [TILA] merely classified those rights for disclosure purposes."). *See also Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1121-22 (9th Cir. 2009) ("We hold that a creditor's undisclosed intent to act inconsistent with its disclosures is irrelevant in determining the sufficiency of those disclosures under sections 226.5, 226.6, and 226.9 of Regulation Z.").

[293]    85 F.3d 577 (11th Cir. 1996).

the required material disclosure of (1) a $21 Federal Express charge in the Finance Charge and only included it in the Amount Financed, (2) the Florida Intangible Tax, and (3) the required number of payments. In addressing the plaintiffs' claims, the court held that "TILA does not require perfect notice; rather it requires a clear and conspicuous notice of recision rights."[294] The court found the particular form at issue "provides sufficient notice that the current transaction may be canceled but that previous transactions, including previous mortgages, may not be rescinded. Such meets the requirements of the law."[295]

The Plaintiffs' primary argument concerning the substance of the 2009 Change in Terms notice is that customers who had "fixed" interest rates understood the term "fixed" to mean "never changing" while Capital One argues that "fixed" in the context of credit card interest rates means a "consistent" value as opposed to "variable" interest rates which are tied to LIBOR.

The Plaintiffs rely on *Rubio v. Capital One Bank*,[296] where the court addressed the use of the term "fixed" on a direct-mail credit card solicitation. Based in part on

---

[294]   *Id.* at 580.

[295]   *Id.* at 581.

[296]   613 F.3d 1195 (9th Cir. 2010).

regulations not yet in effect,[297] the court did determine that "fixed" could "reasonably be interpreted to mean 'unchangeable.'"[298] The Court finds *Rubio* distinguishable. As an initial matter, significantly, the Ninth Circuit applies as standard of "absolute compliance by creditors" with the Truth in Lending Act and Regulation Z and "even technical or minor violations of TILA impose liability on the creditor."[299] The standard of review in the Eleventh Circuit under *Veale* is far less stringent.

Furthermore, *Rubio* is not applicable in the instant case because none of the Plaintiffs here (save Kolkowski) has the solicitation upon which he based his decision to apply for a Capital One credit card. Thus, the Court cannot determine whether those solicitations even used the term "fixed" without any specific deadline. As the Court noted above, Kolkowski's solicitation showed a specific period of time for the promotional rate of 0% APR which is what the new regulation suggests as a means of clarifying the term "fixed."

Moreover, based on the *Veale* standard in the Eleventh Circuit, the Court finds

---

[297] Effective July 1, 2010, Regulation Z bars the term "fixed" from being used in the "Schumer Box" to describe an annual percentage rate unless the creditor specifies a period of time for which the rate will be fixed and will not increase. *See Rubio*, 613 F.3d at 1201.

[298] *Id.* at 1202.

[299] *See Rubio*, 613 F.3d at 1199 (citing *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1118 (9th Cir. 2010) and *Jackson v. Grant*, 890 F.2d 118, 120 (9th Cir. 1989)).

there is nothing unclear or inconspicuous about the terms as used by Capital One in its solicitation materials. The use of the terms "fixed" and "low" in solicitation materials is promotional puffing on the part of the company. At most, "low" and "fixed" means the same rate going forward and not the same rate for life. Some of the Plaintiffs here testified that they did not believe Capital One had the right ever to change the annual percentage rates (unless the consumer violated the terms of the credit card agreement).[300] The Court finds this is not a reasonable understanding of the consumer's rights, particularly when the 2005 Customer Agreement clearly states that Capital One had the right to "add to, remove, amend or change any part of provision of this Agreement, including the annual percentage rates(s)."[301] In fact, half of the Plaintiffs here have conceded that they understood Capital One had the right to change the APR.[302] Given these circumstances, the most natural reading of "fixed" would be "not variable" as a rate based on LIBOR would be.

Finally, the Plaintiffs' own experience with their credit cards showed that Capital One did change the rates on the credit card accounts, sometimes raising the

---

[300]    *See* Barker Depo., at 17, 66; Lavallie Depo., at 8-9, 14, 15-16, 17, 28, 84, 86, 139, 141, 143; Solsberry Depo., at 62; and Roberti Depo., at 5.

[301]    *See* 2005 Customer Agreement, at 2.

[302]    *See* Baxter Depo., at 37-38; Gaffney Depo., at 35-36; Kautz Depo., at 25; Mancuso Depo., at 31-32.

rates and sometimes lowering the rates. As the Court recounted in the statement of facts, the account statements for all the Plaintiffs reflect these changes.[303] Thus, no reasonable jury could find it plausible that the Plaintiffs did not believe that their rates could ever change so long as they complied with the terms of the credit card. The Plaintiffs' rates had increased even before the 2009 Change in Terms.

The Plaintiffs next argue that the 2009 Change in Terms notices mailed to customers did not comply with the Truth in Lending Act and Regulation Z because they were not clear and conspicuous in their meaning. The Plaintiffs contend that the Change in Terms notices never explained that unless the customer specifically declined the new terms of the credit card, the increased interest rates would apply to existing as well as future balances.

The Court disagrees. Although each of the notices mailed to the Plaintiffs contained slightly different formatting and language depending on which particular rates would be increasing, each notice contained a box which had a header of either

---

[303]     *See also* Docket Entry [48], Brief, Appendix at 48 (table showing pre-2009 interest rate ***increases*** for all the Plaintiffs save Roberti who had a variable rate since his account opened in 2008).

"Rate increases in 2009"[304] or "Changes to the terms of your account."[305]  The notices

also provided that if "you decline, you will be able to pay down your balance at your

existing term."[306]  This language leaves no ambiguity that if you do not decline, you

will not be able to pay off your balance at the existing terms.  For those who keep their

credit card accounts open, the interest rates are going up on all balances.  It simply did

not make sense on a credit card account to expect that there would be different

percentages for new purchases – as opposed to your existing balance – if you keep the

account open.[307]

　　　　Furthermore, the 2005 Customer Agreement informs consumers: "Changes to

---

[304]　　*See* Docket Entry [48], Attachment 53, Exh. A-29 (Mancuso); Attachment 58, Exh. A-32 (Mancuso); Attachment 63, Exh. A-35 (Roberti).

[305]　　*See* Docket Entry [48], Attachment 9, Exh. A-5 (Barker); Attachment 13, Exh. A-8 (Baxter); Attachment 19, Exh. A-11 (Gaffney); Attachment 24, Exh. A-14 (Kautz); Attachment 29, Exh. A-17 (Kautz); Attachment 36, Exh. A-20 (Lavallie); Attachment 41, Exh. A-23 (Solsberry); Attachment 47, Exh. A-26 (Mancuso); Attachment 73, Exh. A-41 (Kolkowski).

[306]　　*See* Docket Entry [48], Attachment 9, Exh. A-5 (Barker); Attachment 13, Exh. A-8 (Baxter); Attachment 19, Exh. A-11 (Gaffney); Attachment 24, Exh. A-14 (Kautz); Attachment 29, Exh. A-17 (Kautz); Attachment 36, Exh. A-20 (Lavallie); Attachment 41, Exh. A-23 (Solsberry); Attachment 47, Exh. A-26 (Mancuso); Attachment 53, Exh. A-29 (Mancuso); Attachment 58, Exh. A-32 (Mancuso); Attachment 63, Exh. A-35 (Roberti); Attachment 73, Exh. A-41 (Kolkowski).

[307]　　The Court recognizes that such distinctions may be applicable under the Credit Card Accountability, Responsibility, and Disclosure Act ("the Credit CARD Act") but that Act did not become effective until 2010, after the 2009 Change in Terms.

the annual percentage rate(s) will apply to your existing account balance from the effective date of the change, whether or not the account balance includes transactions billed to the account before the change date and whether or not you continue to use the account. Changes to fees and other charges will apply to your account from the effective date of the change."[308] Thus, the Court finds that it is clear in both the terms of the Plaintiffs' Customer Agreement and the Change in Terms notices that if the Plaintiffs did not decline the new interest rates, those rates would apply to the Plaintiffs' existing balance as of the effective date of the new rates.

For the foregoing reasons, the Court finds that no reasonable jury could conclude that the Defendant failed to provide proper notice under the Truth in Lending Act and the Court GRANTS the Defendant's motion for summary judgment as to this claim.

For the same reasons, the Court also finds that no reasonable jury could believe that the Defendant's decision to raise interest rates on credit cards in the 2009 Change in Terms was "unilateral." The Change in Terms provided consumers with the choice (1) to close their account and pay out their existing balance at the old rates or (2) to keep their accounts open and be subject to the higher interest rates. Because the Court has concluded that the Defendant gave sufficient procedural and substantive notice of

---

[308] *Id.*

the 2009 Change in Terms which offered consumers this choice, the Plaintiffs' argument that consumers were not permitted to retain the credit card terms they originally had with Capital One is without merit. The Plaintiffs had the option of closing their account and paying off their existing balances at the existing terms without any increase in rates or keeping their account subject to the higher rates. The fact that the Court has determined that these changes were not unilateral informs many of the state law claims raised below.

### F.  Implied Contract/Unjust Enrichment

The Plaintiffs' implied contract and unjust enrichment claims are premised on their contention that the Defendant had made promises that the consumers' interest rates would remain "low" or "fixed" forever. The Plaintiffs state these theories are in the alternative to its breach of contract claim. The Defendant argues that the Plaintiffs' implied contract and unjust enrichment claims are barred because the relationship between the Plaintiffs and the Defendant is governed by a written document.

As the Court explained above, under a generous reading of the Plaintiffs' breach of contract claim, the Plaintiffs claimed both that the Defendant violated its promise of "low" or "fixed" interest rates and the Defendant breached the 2005 Customer Agreement in an unspecified manner.  To the extent that the Plaintiffs premise their implied contract or unjust enrichment theory on any actions covered by

the 2005 Customer Agreement, the Court agrees that this claim would be barred under Virginia law by the existence of the written contract governing the parties' relationship.[309]

For any claims that may arise outside the terms of the 2005 Customer Agreement, the Court notes that Virginia law recognizes two types of implied contracts: implied-in-fact and implied-in-law.[310] An implied-in-fact contract "is an actual contract that was not reduced to writing, but the Court infers the existence of the contract from the conduct of the parties."[311] An implied-in-law contract (quasi-contract) "applies only when there is not an actual contract or meeting of the minds."[312] It is possible that the Plaintiffs are attempting to argue that they had an implied contract with the Plaintiffs to keep interest rates "low" and/or "fixed." The Court finds this claim fails for the reasons discussed above. The Plaintiffs cannot point to anything in the record from which a jury could conclude that use of the terms

---

[309]    *See*, *e.g.*, *Royer v. Board of County Sup'rs of Albemarle County*, 176 Va. 268, 280 (1940) ("where there is an express and enforceable contract in existence which governs the rights of the parties, the law will not imply a contract in contravention thereof").

[310]    *See*, *e.g.*, *Rosetta Stone Ltd v. Google, Inc.*, 676 F.3d 144, 166 (4th Cir. 2012).

[311]    *Id.*

[312]    *Id.*

"fixed" and "low" in solicitation materials was anything more than promotional puffing. Nothing in the record shows that "low" and "fixed" meant the same rate for life as opposed to the same rate going forward or as opposed to a variable LIBOR-tied rate. Over the course of the time they held their accounts, the Plaintiffs' own credit cards rates fluctuated up and down which contradicts any notion that the interest rates would never change.

To bring an unjust enrichment claim under Virginia law, a plaintiff must show: (1) he conferred a benefit on defendant; (2) defendant knew of the benefit and should reasonably be expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without paying for its value.[313] The Plaintiffs appear to contend that the benefit they conferred upon the Defendant is increased financing charges the Plaintiffs paid to the Defendant after the rate changes. However, as the Court explained above, the Defendant offered consumers the choice of closing their accounts and keeping their previous interest rates on existing balances, or keeping their accounts and accepting the increased interest charges. Because the Court has determined that the Defendant provided legally adequate notice of the 2009 Change in Terms, the Plaintiffs were offered this choice and the Defendant did not unilaterally impose financing charges which could form the basis of an unjust enrichment claim.

---

[313] *See*, *e.g.*, *Schmidt v. Household Finance Corp.*, 276 Va. 108, 116 (2008).

76

The Court GRANTS the Defendant's motion for summary judgment on the Plaintiffs' implied contract/unjust enrichment claims.

## G.    Unconscionability

The Plaintiffs' unconscionability argument is premised on the general Change in Terms provision in the 2005 Customer Agreement which allows Capital One to "add to, remove, amend or change any part or provision of this agreement."[314] The Plaintiffs allege that this provision is unconscionable because it allows the Defendant to raise interest rates or impose fees "as high as it deems fit."[315] The Plaintiffs assert no reasonable party would agree to a contract where there is no provision to cap interest rate raises. The Plaintiffs contend that they may affirmatively raise "unconscionability" in the context of a declaratory judgment action.

The Defendant responds that "unconscionability" is a defense only and may not be relied upon as an affirmative claim.  Furthermore, the Defendant contends that Virginia law specifically authorizes banks to raise interests rates "as high as they see fit" and that market forces prevent credit card companies from imposing fees so high they would bankrupt a customer.

Without parsing an affirmative claim versus an affirmative defense, as a matter

---

[314]    *See* 2005 Customer Agreement, at 2.

[315]    *See* Resp., Docket Entry [53], at 32.

of policy, Virginia refuses to enforce unconscionable contracts.[316] In *Management Enterprises, Inc. v. Thorncroft Co., Inc.*, the Court defined unconscionability as follows:

> While the jurisdiction undoubtedly exists in the courts to avoid a contract on the ground that it makes an unconscionable bargain, nevertheless an inequitable and unconscionable bargain has been defined to be "one that no man in his senses and not under a delusion would make, on the one hand, and as no fair man would accept, on the other." The inequality must be so gross as to shock the conscience.[317]

The party asserting unconscionability has the burden of proving that the contract is unconscionable by clear and convincing evidence.[318]

It would be very difficult to declare a provision in a contract unconscionable when it does precisely what is authorized by Virginia law.[319] If an act is "so gross as to shock the conscience" one might not expect authorization from the legislature to commit such an act. The Plaintiffs apparently believe that the wording of the Change in Terms provision is broader than the Virginia statute but they fail to explain how. Thus, looking at the provision in isolation, the Court finds that it is not

---

[316] *Smyth Brothers v. Beresford*, 128 Va. 137, 170 (1920).

[317] 243 Va. 469, 473 (1992) (quoting *Smyth Brothers v. Beresford*, 128 Va. 137, 170 (1920)).

[318] *See*, *e.g.*, *Pelfrey v. Pelfrey*, 25 Va. App. 239 (1997).

[319] Va. Code Ann. § 6.2-433(A)-(B) (authorizing bank to raise interest rates after providing notice to card holders).

"unconscionable" on its own such that the Court would refuse to enforce it.

Furthermore, as the Court explained above, the 2009 Change in Terms did not just unilaterally raise the interest rate on consumer accounts. Consumers were given the choice of closing their accounts so that they (and their existing balances) would not be subject to the increased rates. While the general Change in Terms provision of the 2005 Customer Agreement might not have required Capital One to give consumers this choice, under the view of the law most favorable to the Plaintiffs, they can raise an "unconscionability" argument only to the form of asking the Court not to enforce such a contractual provision. Since the 2009 Change in Terms is not an enforcement of general provision in the 2005 Customer Agreement, the Plaintiffs' "unconscionability" argument is misplaced. The Court GRANTS the Defendant's motion for summary judgment as to unconscionability.

## H.      State Law Consumer Claims[320]

### 1.      California Unfair Competition Law

The Plaintiff Kolkowski brings a claim under several California consumer

---

[320]      Because the Court concludes that the Plaintiffs' state law claims do not have substantive merit, the Court need not consider the Defendant's alterative arguments that they are preempted by the National Bank Act, 12 U.S.C. §§ 21 *et seq.* and are time barred.

protection statutes, including California Unfair Competition Law.[321] The Unfair Competition Law prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."[322] The "fraudulent" theory requires the Plaintiffs to show that "reasonable members of the public are likely to be deceived" by the business act.[323]

Kolkowski claims that the Defendant committed "unlawful" practices and "fraudulent acts" because it used the language "low" or "fixed" leaving consumers with the impression that credit card interest rates would remain low and/or fixed. Kolkowski also claims that the Defendant's practice was "unfair" because the harm of the Defendant's act outweighs its utility. Kolkowski argues that her interest rate was increased by 11%, she was not notified of the change, and therefore she was not able to pay off her balance under the existing terms of her agreement. She declined other offers of credit to stay with Capital One believing that she would continue to receive a "low" APR. (Significantly, however, Kolkowski seems to concede that the "repricing itself" was not "deceptive," but rather her issue is with the "manner of imposition.")

---

[321] Cal. Bus. & Prof. Code §§ 17200 *et seq.*

[322] *Id.*

[323] *See, e.g., Rubio v. Capital One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010).

As the Court explained above, Kolkowski is in a different position than the other Plaintiffs because she is the single Plaintiff would could actually identify the solicitation that she received and caused her to apply for a card. In 2005, Kolkowski received a mail solicitation offering "0% Fixed APR on balance transfers AND purchases until December 2006" and a variable APR of 7.99% on balance transfers and purchases thereafter. The language of this solicitation is clear and limits any "fixed" promotional offers to a specific period of time. Kolkowski cannot point to anything "unfair," "unlawful," or "fraudulent" about her particular offering. Kolkowski, therefore, cannot carry a claim that the Defendant's statements were likely to cause the public to be deceived.

As to Kolkowski's claims that the increase in her interest rate and failure to be notified of such changes come within the scope of the Unfair Competition Law, the Court find that the Defendant's actions were authorized by another statute and therefore cannot form the basis of a claim under Unfair Competition Law. Conduct that is affirmatively authorized by another statute may provide a defendant with a "safe harbor" against liability under the Unfair Competition Law.[324] Under Virginia

---

[324] *See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 83 Cal. Rptr. 2d 548, 973 P.2d 527, 541 (1999) ("Although the unfair competition law's scope is sweeping, it is not unlimited. . . . When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor.").

law, the Defendant was permitted to raise interest rates. Under the federal Truth in Lending Act, Defendant provided adequate notice of the 2009 Change in Terms. The Court GRANTS the Defendant's motion for summary judgment as to the Plaintiff Kolkowski's California Unfair Competition Law claim.

## 2. California False Advertising Law

It is unlawful under California law to "make or disseminate . . . in any other manner or means whatever . . . any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."[325] Kolkowski argues that Capital One's advertisements were misleading because they offered "low" or "fixed" interest rates when Capital One then increased Kolkowski's rates "dramatically." Again, Kolkowski's solicitation was quite clear in the time limits for the promotional rate offers. Thus, for the same reasons as given above, Kolkowski cannot succeed on a false advertising claim. The Court GRANTS the Defendant's motion for summary judgment as to Kolkowski's California False Advertising Law claim.

## 3. California Consumer Legal Remedies Act

The California Consumer Legal Remedies Act prohibits "unfair or deceptive acts or practices" including:

---

[325]    *Id.*

"Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have..."; "Advertising goods or services with intent not to sell them as advertised."; "Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."; "Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not."; and "Inserting an unconscionable provision in the contract." [326]

As the Defendant points out, several California courts have held that the California Consumer Legal Remedies Act does not apply to credit cards.[327] In *Berry*, the court held that the California Consumer Legal Remedies Act does not apply to credit card transactions because such transactions do not result in the sale or lease of goods or services to a consumer.[328]

The Plaintiffs ask the Court to reject the analysis in *Berry* contending that the plain language of the statute covers credit cards, citing *Davis v. Chase Bank U.S.A, N.A.*[329] The Court declines this invitation. *Berry* was decided by a California court applying California law directly on point. *Davis* addressed issues of preemption and did not even consider the holding in *Berry* that the Consumer Legal Remedies Act

---

[326]   Cal. Civ. Code § 1770(a).

[327]   *See*, *e.g.*, *Berry v. American Express Publishing, Inc.*, 147 Cal. App. 4th 224 (2007).

[328]   *Id.* at 229.

[329]   650 F. Supp. 2d 1073, 1086 (C.D. Cal. 2009).

does not apply to credit card transactions.

The Court GRANTS the Defendant's motion for summary judgment as to Kolkowksi's Consumer Legal Remedies Act claim.

### 4. Kansas Consumer Protection Act

The Kansas Consumer Protection Act states that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction."[330] The Plaintiff Kautz states that the Defendant violated this Act because it proffered solicitations which knowingly represented characteristics of the credit card that the card did not have. She also argues that the Defendant failed to provide adequate notice of the increase in interest rates.

Kautz was not able to identify any specific solicitation to which she responded and therefore she has no basis for making a claim regarding "fixed" or "low" rates. Kautz also testified that she understood the Defendant could raise the interest rates on her credit card but that it would not be "right" for Capital One to raise her interest rates so long as she was in "good standing" under the credit card.[331] So long as Kautz was not deceived by the terms "low" and "fixed," she cannot bring a claim under the Kansas Consumer Protection Act.

---

[330] K.S.A. 56-626(a).

[331] *See* Kautz Depo., at 25.

84

Kautz stated that she never received the 2009 Change in Terms notice, so she cannot argue that any wording in that notice was deceptive. In any event, even if she were contending that notice was inadequate, the Court has found above that the Defendant satisfied the disclosure requirements of the Truth in Lending Act, and that the notices were clear in explaining that unless the consumer closes his account, the higher rates would apply to existing balances. The Court GRANTS the Defendant's motion for summary judgment on Kautz's Kansas Consumer Protection Act claim.

### 5.    New Jersey Consumer Fraud Act

The Plaintiff Mancuso brings claims under New Jersey's Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-2 *et seq.* which provides:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.[332]

To state a claim under the New Jersey Consumer Fraud Act, a plaintiff must show "(1) unlawful conduct by defendant; (2) an ascertainable loss by plaintiff; and (3) a causal

---

[332]    N.J. Stat. Ann. 56:8-2.

relationship between the unlawful conduct and the ascertainable loss."[333]

Again, Mancuso cannot point to any misleading or deceptive representation made by Capital One because she does not have the original solicitations. Further, she testified that she understood her credit card rate could go lower or higher. Although Mancuso testified that she did not receive notice of the 2009 Change in Terms, as the Court has explained above, the Defendant satisfied the requirements of substantive and procedural notice under the Truth in Lending Act, as well as any general understanding of whether the increased rates would apply to existing balances if a consumer did not close his credit card account. The Court GRANTS the Defendant's motion for summary judgment on Mancuso's New Jersey Consumer Fraud Act claim.

### 6.   Summary

The Plaintiffs argue that the Defendant should not have been able to undertake the 2009 Change in Terms plan because: (1) it violated promises made to the Plaintiffs that rates would be "low" and "fixed"; (2) the "enormous" interest rate increases were outside the market range; (3) the Defendant failed to give proper notice; (4) the Defendant made the changes in an attempt to avoid the consequences of the Credit CARD Act which was set to become effective shortly after the Defendant

---

[333]   *Bonnieview Homeowners Ass'n v. Woodmont Builders*, 655 F. Supp. 2d 473, 504 (D.N.J. 2009) (quoting *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 964 A.2d 741, 749 (N.J. 2009)).

implemented the plan; and (5) the Defendant made the changes because it desired to make more money. The Plaintiffs are unable to show any contractual duty on the part of the Defendant to keep rates "low" and "fixed." The Defendant offered consumers a choice as to whether to keep the credit card or not. For this reason, the Plaintiffs cannot argue that the Defendant increased its interest rates "outside the market range." If consumers did not want to pay interest rates that high, they could close their accounts. The Defendant complied with requirements under federal law in the substantive and procedural notice it gave to consumers. The Credit CARD Act has no retroactive effect. There is no legal significance to the possibility that any of the actions the Defendant took in the 2009 Change in Terms might have been barred under the Credit CARD Act. While the Plaintiffs may have pointed out difficulties the Defendant had in implementing the 2009 Change in Terms, the Plaintiffs have not been able to link any of this evidence to their particular causes of action.

### III. Conclusion

The Court GRANTS the Defendant's motion for summary judgment [Doc. 48]. The Clerk of the Court is DIRECTED to DISMISS WITH PREJUDICE the Plaintiffs' Amended Complaint.

SO ORDERED, this 30 day of September, 2014.

/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge